OPINION OF THE COURT
Elaine Slobod, J.
These are proceedings commenced by the Orange County Department of Social Services on January 22, 1988 under the *981 child protective provisions of article 10 of the Family Court Act against the respondent, the mother of five young infants.
The initial petition, encompassing all five children of the respondent mother, is based upon the allegation that on January 18, 1988 respondent either caused or allowed another to cause the death of her 9-month-old infant son, "V. E.”
Subsequently, petitions were filed by the Department (1) for an order against respondent and her husband adjudicating their surviving child "N.”, " 'permanently neglected’ ”, within the meaning of section 384-b of the Social Services Law, due to their alleged failure to maintain contact with this child for more than one year (Social Services Law § 384-b [7] [a]), and (2) for an order adjudicating said child "N.” "permanently neglected” by the respondent mother due to the latter’s "intellectual, emotional and developmental deficits”. (" 'Mental illness’ ” and/or " 'mental retardation’ ” as defined by the provisions of section 384-b [6] [a] and [b] of the Social Services Law.)
For reasons more fully examined hereafter, this court is convinced that the public and its State and local legislative representatives must become more fully informed of the realities of abuse/neglect proceedings and the foster care system into which many children are placed following removal after a finding of neglect or abuse has been made. Therefore, counsel for the respective parties, including the Law Guardian, were advised that the court would, on its own motion, invite the local daily press to present legal arguments along with those of respective counsel on the issue of whether or not the news media should be conditionally allowed to cover these "closed” proceedings.
On June 1, counsel, including a legal representative of The Times Herald Record (hereinafter referred to as The Record), appeared for oral argument on the above issue.
At the very outset of the presentation of legal argument, counsel for the respondent objected to the presence in the courtroom of Lawrence J. Lebowitz, a reporter for The Record, until the underlying legal issue of opening this closed proceeding to the press had been determined. Although much of the colloquy regarding this reporter’s presence was "off the record,” it was clear that the undersigned eventually permitted the latter’s presence during legal argument only in his capacity as a representative of his paper, and not in his capacity as a reporter, a distinction offered by counsel for The Record.
*982 At the conclusion of legal arguments, decision was reserved pending submission of briefs. At this juncture counsel for the respondent sought a directive from the court specifically enjoining The Record from publishing the facts of the legal argument as they might encompass confidential information about his client and the children. Since The Record had agreed not to publish names and other identifying factors related to the children and since no facts had been revealed during oral argument which were not already in the public domain, this court denied respondent’s request. However, in order to give respondent’s counsel a minimum of time to seek an appellate stay of the denial of his oral application, the court temporarily directed The Record through its counsel and through its representative, Lawrence J. Lebowitz, not to publish for 22 hours.
In violation of this minimum restraining order, The Record printed a story on the very next morning of June 2, acknowledging therein that it had in fact been directed by this court not to print until what would have been later that day. As it turned out, the respondent did not seek a further stay from the Appellate Division nor did The Record seek appellate reversal of this temporary restraining order.
Before postargument written memoranda could be submitted on the issue of opening this proceeding to the press, the respondent commenced a proceeding against The Record and its reporter, Lawrence J. Lebowitz, for contempt of the 22-hour restraining order and for an order directing an investigation of suggested professional misconduct of counsel for The Record related to the violation of the temporary restraining order.
The Record’s answer to the contempt proceeding came in the form of a cross motion seeking reargument of the undersigned’s issuance of the temporary restraining order itself and for dismissal of the contempt proceeding based on the alleged lack of jurisdiction of any court to issue a prior restraint against the press in matters involving "pure speech”.
Therefore, before considering the issue of whether and to what extent the press should be permitted to cover the instant neglect proceeding, the court is constrained to consider these preliminary applications precipitated by the actions of its invitee, The Record.
At the outset, the respondent’s application, as it relates to counsel for The Record, is denied and the application, as it relates to said counsel, is hereby dismissed.
*983 Assuming, for the sake of argument, that personal service of the order to show cause, seeking relief against counsel, was properly effected in accordance with its terms, which it was not, this court in any event has no authority to direct an investigation of an attorney’s professional misconduct. The Legislature has vested that authority in the Appellate Divisions of the Supreme Court (Judiciary Law § 90 [2]), each of which operates under its own guidelines (cf., 22 NYCRR part 691). While every court is obliged to report professional misconduct to the proper agency, only the Appellate Divisions have the authority to consider this aspect of respondent’s application.
CRIMINAL CONTEMPT
No factual hearing was held on the contempt application and cross motion of The Record as it appears that there is no question that The Record and Mr. Lebowitz have in fact violated a specific order of the court. It has been acknowledged in both news articles and in The Record’s editorial pages that they were in fact publishing in violation of a specific temporary restraining order of this court.
However, as a complete defense of their actions, The Record alleges that the press can ignore a court order which it believes constituted a prior restraint of their First Amendment rights of freedom of the press. Specifically it is claimed that the press has immunity from contempt proceedings if it decides that the order in question was a "transparently unconstitutional” restraint against "pure speech”.
At issue is the conflict between "the hallowed First Amendment principle that the press shall not be subjected to prior restraints” and "the sine qua non of orderly government, that, until modified or vacated, a court order must be obeyed.” (Matter of Providence Journal Co., 820 F2d 1342, 1344.)
However, the First Circuit’s decision in Providence (supra), and most of the precedents upon which Providence relies, were concerned with "open court” proceedings primarily between adult litigants. In Providence, it was also pointed out that a prior restraint would not only have been ineffective to protect the interests of the individual under scrutiny but that the individual also had an alternative remedy to mitigate the effects of any publicity which did occur, namely, money damages.
The instant proceeding is a "closed” confidential proceeding, *984 in a court where alternative relief such as monetary damages is not a consideration. Quite simply monetary damages would be meaningless for a child who experiences public stigma in addition to the wrenching trauma of abuse or neglect.
In the dynamics of our governmental scheme, the First Amendment proscribes prior restraint of the dissemination of "free speech” by the press. This has been so even in the most trying of times when statesmen, such as Thomas Jefferson, have been driven to deplore "the putrid state into which our newspapers have passed” for the press “is * * * an evil for which there is no remedy. Our liberty depends on the freedom of the press, and that cannot be limited without being lost” (Padover, Democracy, at 150-151).
However, just as significant an element in our governmental process is the inviolability of court orders. "People simply cannot have the luxury of knowing that they have a right to contest the correctness of the judge’s order in deciding whether to willfully disobey it * * *. Court orders have to be obeyed until they are reversed”. (Southern Ry. Co. v Lanham, 408 F2d 348, 350 [5th Cir 1969].) For "respect for judicial process is a small price to pay for the civilizing hand of law” (Walker v City of Birmingham, 388 US 307, 321 [1967]).
The Record contends that this court’s 22-hour restraining order, issued only to maintain the "status quo” until respondent could seek a stay of the underlying decision, constituted a "transparently invalid prior restraint” which the press need not first challenge in court since such an order cannot form the basis for a contempt citation (Matter of Providence Journal Co., 820 F2d 1342, cert dismissed — US —, 99 L Ed 785 [May 2, 1988], supra).
However, reporters who test the indistinct line between what is and what is not a transparently invalid order (see, Matter of Providence Journal, supra, at 1347) take a chance for
"As civil disobedients have done before they ran a risk, the risk being magnified in this case by the law’s policy which forecloses their right to assert invalidity of the order as a complete defense to a charge of criminal contempt. Having disobeyed the Court’s decree, they must, as civil disobeyers, suffer the consequences for having rebelled at what they deem injustice, but in a manner not authorized by law.”
"Significantly, it is only the orders of judicial authorities which must be tested in the courts before deliberate transgres *985 sion can be excused on an eventual determination that the order was invalid.
"The criminal contempt exception requiring compliance with court orders, while invalid non-judicial directives may be disregarded, is not the product of self-protection or arrogance of Judges. Rather it is born of an experience-proved recognition that this rule is essential for the system to work. * * *
"[The press] too may sometimes have to wait. They are not yet wrapped in an immunity or given the absolute right to decide with impunity whether a Judge’s order is to be obeyed”. (United States v Dickinson, 465 F2d 496, 513, 510-512 [emphasis supplied].)
Quite clearly the three conditions for a valid order were present when the instant order of this court was issued, viz., (i) subject matter and personal jurisdiction, (ii) an adequate and effective avenue for orderly review, and (iii) the order did not require an irretrievable surrender of constitutional guarantees (United States v Dickinson, supra, at 511).
It is significant that in many of the United States Supreme Court cases cited by The Record, where prior restraints have ultimately been declared unconstitutional, temporary restraining orders nevertheless were in place and obeyed even when the information in question had been garnered in "open court.” (Cf., Oklahoma Publ. Co. v District Ct., 430 US 308; New York Times Co. v United States, 403 US 713.)
The term "open court” as used in this line of cases is not the all-encompassing technical term defined by the New York Court of Appeals in Matter of Dolgin Eldert Corp. (31 NY2d 1, 4-5) which includes every court in session, whether open to the public or closed.
The "open court” proceedings discussed in relation to the prohibition against prior restraints of the press were or had become "public hearing[s]” (cf., Nebraska Press Assn. v Stuart, 427 US 539, 568). Even the technically "closed” juvenile hearing reviewed in Oklahoma Publ. Co. (430 US, supra, at 312) had become a "de facto” public hearing, at which members of the press were permitted in with full knowledge of and the tacit approval of the Judge who issued no conditions on their presence and against whose presence defense counsel made no objection.
The instant proceeding was confidential and closed by both statute and rule (Family Ct Act §§ 1043, 166; 22 NYCRR 205.4, 205.5) until affirmatively opened after review of the *986 considerations set forth in the provisions of 22 NYCRR 205.4. At the hearing of legal arguments, it was made clear that Mr. Lebowitz could attend as a representative of his employer but not in his capacity as a reporter.
The very purpose of the hearing was to permit this court, which is empowered and obligated to exclude the public (Matter of Herald Co. v Mariani, 67 NY2d 668, 669), including the press, to decide whether or not to open the court to the press.
It is ironic that The Record usurped that power and summarily decided the issue in its own favor.
The information The Record gathered was received in a "closed” and "confidential” proceeding, which had not been opened to the press. Thus, any information received and published was done so in an improper fashion without even the implicit approval of the court (cf., Cox Broadcasting Corp. v Cohn, 420 US 469, 498).
It is clear that this court which is obligated to restrict public access, including the press, can set conditions and restrictions when permitting access to its proceeding (cf., Saxbe v Washington Post Co., 417 US 843, 848). Having set such conditions which were in turn intentionally violated, the court finds that there was a willful violation of its order.
However, given the uncertainty in the law regarding this sometimes collision between the rights of the press to be free of prior restraints and the obligation of the courts to see that their orders are enforced, this court determines that the violation was not culpable or deserving of punishment (United States v Dickinson, supra, at 513). Accordingly, no sanctions will be imposed particularly since The Record and counsel could readily have interpreted the decision in Providence Journal (supra) as sufficient legal precedent to support their actions and they were certainly unfamiliar with the working of the Family Court.
The court nevertheless cautions the press that until overruled by appellate court order, any future orders must be adhered to under penalty of appropriate sanction. The court invites appeal on this issue rather than have it burdened with future contempt proceedings for which it and the press have little time.
OPENING ARTICLE 10 PROCEEDINGS TO THE PRESS
Proceeding then to the main issue, the undersigned feels *987 compelled to conditionally open her court to the press in this proceeding and to invite it to seek permission to cover other child protection proceedings and related foster care matters.
As a general rule, "[T]he traditional * * * veil of confidentiality descends upon all [Family Court] proceedings” (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 725.15, at 252; see, 22 NYCRR 205.4, 205.5; Family Ct Act § 166; and Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 166, at 124).
Due to the particularly sensitive nature of child protective proceedings and the obligation of the Family Court to act as "parens patriae” of innocent children, the Legislature has specifically reiterated in section 1043 of the Family Court Act its general directive of confidentiality, set forth in section 166, namely, that the court may exclude the public from any hearing under article 10 of the enactment.
While the Family Court has traditionally been closed, the scheme of the Family Court Act is such that Judges are left with discretion to permit access to the public. (Cf., Besharov, Practice Commentary, op. cit., at 124.) The revised Uniform Rules of this court (22 NYCRR 205.4) establish the factors to be considered in making this determination.
The only relevant factor enumerated by 22 NYCRR 205.4 which affects this proceeding is subdivision (b), for respondent vehemently objects to the presence of the press. However, given the fact that the underlying matter has already been widely publicized, the respondent has pleaded guilty to a manslaughter charge on the related matter in the County Court and the press has agreed not to identify the parties or the children, the court believes that the basis for respondent’s objections is essentially negated.
The enactment and rules strongly suggest that it is proper for the press to be allowed into the Family Court. The Appellate Division of the Fourth Department found no fault with the presence of the press in a visitation matter (Matter of Elizabeth D., 127 AD2d 971) and the court (Schwartz, J.) in Matter Chase (112 Misc 2d 436) articulated the following before deciding to admit the press into a juvenile delinquency proceeding, with which reasoning the undersigned concurs:
" '[J]ustice may not be done in a corner nor in any covert manner’ voices the Anglo-American abhorrence of secret trials. * * *
*988 "The public character of judicial proceedings serves to assure the very integrity of the process. '[It] has long been recognized as an indispensable attribute of an Anglo-American trial’ * * *. 'The principle that justice cannot survive behind walls of silence has long been reflected in the "Anglo-American distrust for secret trials”.’ * * *
"Public confidence in the administration of justice requires public access to observe judicial processes.
"The analytical foundations of the First Amendment right of access appear virtual truisms: The First Amendment plays a structural role in our system of government. 'Implicit in this structural role is not only "the principle that debate on public issues should be uninhibited, robust, and wide-open,” New York Times Co. v Sullivan, 376 U.S. 254, 270 (1964), but the antecedent assumption that valuable public debate — as well as other civic behavior — must be informed.’ (Richmond Newspapers v Virginia, [448 US 559,] supra, p 587 [Brennan, J., concurring].)
"Public access to juvenile trials need not affect the confidentiality of records, nor, indeed, need the anonymity of the juvenile be sacrificed.
"Whatever the practice of private or semiprivate adjudicatory proceedings, the claim of the press serves as the catalyst for re-examination of that policy particularly within the context of recent major jurisprudential developments.” (Supra, at 438-450.)
This court must add to the above-salutary effect of press coverage the particular need for the public as well as the State Legislature to be informed of the crisis in our society involving child abuse and neglect and the inherent inadequacies of the systems established to protect children including the foster care programs. (Cf., Matter of L., 24 Ore App 257, 546 P2d 153 [1976].)
In deciding whether to open Family Court proceedings, the paramount question that must be answered is whether the parties and children are better served by retaining the veil of confidentiality that covered the Family Court from its inception or by lifting that veil and laying bare the breadth of society’s ills which lie beneath. This veil of secrecy if left in place will not necessarily serve the needs of families and, in particular, children in the foster care system.
It is necessary to open the Family Court in order that the public learns about the plight of children who enter the child *989 protective system. Although the court process is just one element of that system, opening the process to the public through the media should provide a valuable insight for the public into some of the problems enumerated hereafter.
Much has been written and said on the topic of child abuse. The public is much more aware than it was just five years ago. Five years ago our local Task Force on Child Abuse couldn’t attract more than a handful of people to its annual meeting. This year well over 100 interested people attended. There are now programs in the schools both for teachers to better identify children who are being abused and report it to the appropriate authorities, and to encourage children who are being abused to come forward and be helped.
The problem is that the public has little understanding of what happens to these children once they are identified and the child protective system comes into play. The Governor’s Task Force on Permanency Planning for children has undertaken to educate the judiciary as well as other professionals regarding the true plight of children in the child protective system and the need of those children for permanent homes. This Task Force was created once it was realized what was happening to children when they entered the foster care system. However, the Task Force has not been able to convince the Legislature of the need for funding the various programs it recommended. It may or may not have been significant that Orange County’s CASA program met the same funding rejection from one local State legislator at the very time when a CASA volunteer may have been able to detect the apparently unreported deterioration of the subject family.
It would appear from the articles printed by The Times Herald Record that the press believes that children removed from their natural parents and placed in foster care generally live in loving nurturing homes and that when Judges return these children to their natural parents, we expose these children to the risk of serious bodily harm, including death, a risk not present in foster care. Such simple notions are far from reality.
At a recent conference sponsored by the Governor’s Task Force, a movie was shown about a young man who had been in the foster care system. The story, an actual case history, was told in the child’s own words as he had written them in his diary, before he committed suicide. It was clear that his desperation and death were directly caused by his experiences *990 in foster care. Unfortunately, the message of this movie has more relevance in Orange County than anyone would like to believe. In child protective cases, the choices the courts are called upon to make are rarely clear cut. The only way one can fully comprehend the realities with which the Family Court deals is to be here to see what is presented on a daily basis.
It should be made clear that indeed we have many foster homes that are warm and loving, which provide the much needed structure and consistency required by foster children. Those foster parents are to be commended. We simply do not have enough of them. Far too many reports are received by this court indicating that children have had to be removed from foster homes because of alleged sexual, physical or emotional abuse by the foster parent(s) or some member of their household. Recently this court has found it necessary to order investigations of several foster homes because of foster children’s allegations that they have been physically abused by their foster parents. One home recently preferred to close rather than go through any remediation.
There are children who are placed in perfectly fine foster homes who because of their behavior cannot be continued in foster care. After several failed foster placements these children often must be placed in institutions.
Too many of our children have similar experiences to those of the young man portrayed in the Task Force movie. Too many are dying emotionally. They resist forming any meaningful relationships because they may lead only to hurt and rejection when they are moved again.
Perhaps these children could be maintained in foster care if we had sufficient auxiliary services available to assist foster parents. However, it appears that full preventive services are only available to families whose children are at risk of being placed in foster care. Whether this result was intended by the Legislature is unclear; however, not all auxiliary services are provided by the local agency to foster homes.
Lest anyone think that children are safe in institutions, it should be known that children are not infrequently abused by other children as well as members of the institution’s staff. The saddest ending for children who become institutionalized is that they often become children without a family. Their former foster parents often don’t or can’t visit. Since their natural parents are unwilling or incapable of maintaining contact, they have no one.
*991 Because of the critical shortage of foster homes, most of the available foster homes are filled to capacity. As a result, siblings are often separated. The high turnover rate and resulting vacancies of positions for aides and caseworkers within the Department of Social Services impinge on the Department’s ability to facilitate visitation between siblings.
Every child in foster care for more than 30 days is assigned a Law Guardian. However, a Law Guardian is a lawyer, appointed to represent a child in a particular court proceeding. When that proceeding is over, so is the Law Guardian’s appointment. Thus these children are left without any independent representation between court proceedings.
There are also inadequate mental health services for our children in this county. As a result, foster children who are desperately in need of help in dealing with the initial abuse or neglect, the trauma of separation from their families, and the difficult adjustment to foster care, wait far too long to receive counseling. Because some kinds of counseling, such as sex abuse victim counseling, are only available in a few areas of our county, children must travel long distances for that treatment. There have been some cases in which children as young as 10 years old have been permitted to travel alone in a cab from Port Jervis to Goshen because there was no caseaide available to accompany them. Other children have had their therapy terminated or interrupted because of the lack of a caseaide to accompany them to therapy sessions.
The children who remain in their natural homes and who do receive preventative services often fare no better than the children in foster care. While there are families that respond enthusiastically to the services offered to them and are able to become functioning families providing their children with nurturing loving homes, too often these services are simply not available or only available on an intermittent basis. It is also not uncommon for parents to only marginally avail themselves of the services offered.
It is clear that until the children of this county receive the necessary services and resources that they need, too many children will suffer needlessly. This court believes that those services and resources will not be realized until the public demands them. Certainly, the public will not demand them until it fully understands the seriousness of the situation. This court is not so naive as to believe that the establishment of adequate services and resources will eliminate the possibility *992 of another tragedy such as occurred to the subject family. Human nature and relationships are such that even if we have the best trained caseworkers carrying ideal caseloads, the finest and highly trained Judges, the most capable and dedicated mental health professionals all implementing the wisest of laws to protect children, we could not save every child. For no one or combination of persons who work within any system dealing with the uncertainties of human nature can predict the future. Nevertheless, the courts are called upon everyday to predict future behavior. To even approximate accurate predictions, the courts need as much reliable information as possible. Courts must then be assured that when they order remedial services, they will provided in a timely and meaningful fashion.
By permitting the press into our courtrooms we should give the public. a clearer perspective of this aspect of society’s problem. As previously indicated, in this proceeding the press has agreed not to print the names of the children and otherwise allude to their residence or identity. There is no reason to believe that the press and the court cannot work out reasonable general guidelines.
It is recognized that opening this court will mean that from time to time the court and the press will differ on the guidelines the court sets with regard to the press’s presence in a particular case. However, that is a far healthier situation that we presently have.
There is little doubt that the press will find fault with some aspects of the judicial process. All courts should welcome constructive criticism arising from the press’s actual observations. Certainly the court process itself as well as the delivery of auxiliary services involving these matters are or have become cumbersome and are in need of meaningful change. The perception of outside observers may provide some valuable insight. Such informed criticism would be a welcome change from past criticism which was based on assumption which in turn were founded on misconceptions of what actually happens in the court. Because the press has been routinely denied access to this court, its available sources may have been unreliable and jaundiced by emotion. The court is concerned that the public without accurate reporting of the facts will fail to demand from its elected representatives what is truly needed to properly address the problems affecting abused children. Current child protective laws need to be *993 studied and modified, a review is already undertaken by a panel recently appointed by this State’s Chief Judge.
In the interim, this court does not quarrel with the press’s role in championing changes in the law. The power of the press and the power of the judiciary both must be wielded responsibly. The law forbids the court from publicly commenting on a pending case. It also forbids the Department of Social Services from making public comments regarding their cases. As a result, the press has only had access to those who either have their own agendas or guilt to contend with and are thus more than willing to manipulate and project. Therefore, courts should not prohibit the press from the courtroom, which arena would provide a primary source for obtaining accurate facts, and then resent its lack of knowledge.
Thus, in an attempt to help inform the public and our legislative representatives regarding these issues of great public concern it seems imperative that the press be permitted to cover these proceedings.
With regard to other proceedings, the court invites the press to maintain a regular presence in her court. The undersigned will invite the press to assist in drawing up workable general guidelines.
Accordingly, the press shall be permitted to cover the remaining proceedings in the above-entitled matter subject to the aforementioned conditions and any additional conditions which the court believes must be imposed in the future for the benefit of parties and children as circumstances dictate.