[641 NYS2d 621]

In the Matter of RUBEN R. and Others, Children Alleged to be Abused. AWILDA M.-L. et al., Respondents; COMMISSIONER OF SOCIAL SERVICES et al., Appellants, and DAILY NEWS L. P. et al., Intervenors-Respondents.

First Department, April 23, 1996

### APPEARANCES OF COUNSEL

*Barbara H. Dildine* of counsel *(Kenneth Rabb* on the brief, attorney), for infants and *Law Guardian.*

*Eve B. Burton* and *Adam Liptak* for intervenors-respondents.

*Pamela Seider Dolgow* of counsel, New York City *(Jane S. Earle* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant.

### OPINION OF THE COURT

Tom, J.

This appeal concerns the sensitive balance which must be struck between the potential trauma to the mental and physical well-being of the children in question which would result from the public dissemination of certain personal aspects of their lives, and whether those concerns outweigh the interests of the press in having free access to judicial proceedings.

The matter before us arises from the brutal murder of Elisa Izquierdo, an episode which shocked New York City, became world-wide news, and led to a reevaluation of the mechanisms which are designed to protect the welfare of the City's children. On November 22, 1995 Elisa, six years old at the time, was pronounced dead at Beekman Downtown Hospital as the result of severe trauma to the head. At the time of her death, Elisa resided with her mother, Awilda M.-L., her stepfather Carlos L. (collectively, the Parents), and her five half-siblings, Ruben R. (nine years old at the time of Elisa's death), Kasey M. (eight years old), Taisha L. (five years old), Carlos L. (three years old) and Rafael L. (two years old).

The surviving children were subsequently removed from the custody of the Parents, based upon allegations of child abuse, and placed in emergency foster care, where they remain to date. Awilda M.-L. was subsequently indicted on charges of murder in the second degree and endangering the welfare of a child and is presently incarcerated. Carlos L., who is also presently incarcerated, was arrested five days prior to Elisa's death on a parole violation, having previously been convicted of assault.

Since Elisa's death, intensive coverage of both the life and the circumstances surrounding her death has appeared in both the print and broadcast media. In the course of this coverage, the press has disclosed the identities of the surviving children and on November 29, 1995, the New York Post printed the full names and ages of the two oldest children, Ruben and Kasey. Other examples of press coverage include: the full names of Ruben and Kasey again appearing in the New York Post the following day, together with a photograph of Ruben above the caption "Social workers lead Elisa's brother, Ruben R[.], to a waiting car outside funeral home in Brooklyn yesterday" (New York Post, Nov. 30, 1995, at 15); Ruben's full name appearing in the New York Daily News on November 30, 1995, together with the alleged quote " 'Will my sister go to heaven?' asked a teary Ruben R[.], 9" (New York Daily News, Nov. 30, 1995, at 3); Elisa's death was the cover story of the December 11, 1995 issue of Time magazine, and a color photograph of the respondents, "with three of their children" (Ruben, Kasey and Taisha), appeared on page 35; and on November 29, 1995, an account of the Grand Jury testimony of Ruben and Kasey concerning Elisa's death appeared in the New York Post ("Siblings' Shocking Testimony of Terror", New York Post, Nov. 29, 1995, at 3).

On November 24, 1995, the Commissioner of Social Services filed a petition in New York County Family Court charging the Parents with the abuse and neglect of the surviving children. The allegations supporting the petition, both horrific and numbing, will not be delineated herein.

On November 29, 1995, the case appeared on the Family Court calendar and the respondent Parents were assigned counsel. The Family Court thereafter entertained an application from several members of the press to cover the child protective proceedings. At the time, reporters from WCBS, the New York Post, the New York Times, the Associated Press, the Daily News and New York 1 were present in the courtroom.

The Law Guardian opposed the application and requested that the press be excluded from the courtroom while the factual basis for closure was set forth, which would include testimony from a social worker, who was to explain the negative impact press coverage would have on these particular children. The Law Guardian also informed Judge Schechter that a psychologist, who had interviewed a number of the children, was also available to support the Law Guardian's application for a closed courtroom and to establish that an open courtroom

would result in irreparable harm to the children. The Law Guardian further asserted that the presence of the press at the proceeding would continue to victimize the children, violate their privacy rights and expose intimate details of their lives as yet undisclosed to the public.

In addition to the Law Guardian, counsel for the Commissioner of Social Services, as well as both respondents, opposed press coverage. The Commissioner maintained that he is required, by statute, to protect the confidentiality of the children and that press coverage would thwart those statutory goals. At the conclusion of argument, the Family Court ruled that the press would be allowed to attend the proceedings.

The Law Guardian obtained a stay of the Family Court proceedings from this Court pending an appeal of the Family Court ruling and subsequently, upon the application of the media's attorneys, the stay was modified to the extent that a preliminary hearing on the issue of press coverage was allowed to go forward so that a full record could be developed with a view toward a subsequent appeal.

Judge Schechter then reopened the proceedings to permit attorneys from the press, who previously did not have an opportunity to argue, to state their positions on the record. The Law Guardian, counsel for the Commissioner and the respondents reiterated their opposition to the presence of the press. In addition, the Law Guardian again requested that the court exclude the press during her argument because there was sensitive information concerning the children she did not wish to make public. The court denied the request.

As a result of the court's ruling, the Law Guardian, during argument, refrained from discussing the details of the children's past or present circumstances and the psychological harm so as to avoid disclosure to the media of sensitive information. However, the Law Guardian did submit, under seal, two affidavits prepared by a psychologist and a certified social worker, in support of her position. The Law Guardian further argued that protections such as not publishing the children's names in accounts of the abuse proceedings would be futile since their names, and pictures, had already been disseminated by the media.

In a written decision dated December 11, 1995, the Family Court denied the application "for a blanket exclusion of the press" from the pending Family Court Act article 10 child abuse and neglect proceeding involving the five surviving siblings of Elisa Izquierdo "[i]n spite of the court's sympathy

for the children's feelings". The Family Court held, in pertinent part, that: the closure of the court is authorized, but not mandated, in appropriate cases (Family Ct Act § 1043); the press, to date, had "comported themselves in an orderly and professional manner" and had not, in any way, been disruptive to the proceedings; despite the fact that all four parties to the proceeding had objected to the presence of the press, this factor was afforded little consideration; with regard to the respondent Parents, there was little privacy left to protect; with regard to the children, the court concluded, after reviewing in camera the sealed affidavits of the psychologist and social worker, that "[v]ictims of abuse often experience the torment of self-blame * * * [t]his sense of guilt [however] arises from within * * * not from the press";* and that it would entertain applications to exclude the press "for those brief portions of testimony that may pertain to especially sensitive details not already in the public domain." In conclusion, the court, rather remarkably, seemed to indicate that the underlying tragedy, and the ensuing public debate, provided an appropriate opportunity to educate the public as to the "essential * * * role of the Family Court in the child protective process", which, thereby, overrode any potential, long-term damage that would result to the children.

The Law Guardian and the Commissioner of Social Services appeal and we now reverse.

It is a well-established principle that public access to court proceedings is strongly favored, both under Federal law (US Const First Amend; *Richmond Newspapers v Virginia,* 448 US 555, 580-581; *United States v Doe,* 63 F3d 121, 125-126) and New York State law (NY Const, art I, § 8; *Matter of Capital Newspapers v Moynihan,* 71 NY2d 263, 265; *Lee v Brooklyn Union Publ. Co.,* 209 NY 245). Indeed, this principle is firmly embodied, although not without qualification, in section 4 of the Judiciary Law, which states: "The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, sodomy, bastardy or filiation, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court."

---

* The basis, or psychological doctrine, upon which this profound conclusion is based is left unidentified.

In *United States v Doe* (*supra*, at 126), the Second Circuit Court of Appeals, in speaking to the fundamental importance of conducting open trials, stated: "Beyond enhancing the fairness of the trial itself, openness has broader value in the general administration of justice. '[T]he sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known,' *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 * * * thereby contributing to the public's perception of fairness in the criminal justice system and 'heightening public respect for the judicial process.' *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606."

Thus, an open forum serves to protect the accused from "secret inquisitional techniques" and unjust persecution by governmental authorities and goes far to insuring the defendant a fair trial (*People v Jelke*, 308 NY 56, 62; *Matter of Westchester Rockland Newspapers v Leggett*, 48 NY2d 430, 437).

In an effort to provide further guidelines by which audiovisual coverage of judicial proceedings may take place, the Chief Administrator of the Courts has set forth various criteria to be utilized in determining whether permission for such coverage should be granted. Among the relevant factors to be considered, although the list, by its own terms, is not complete, are: the type of case; whether coverage would cause harm to any participant; whether coverage would interfere with the fair administration of justice; and whether coverage would interfere with any law enforcement activity (*see*, 22 NYCRR 131.3, 131.4).

The right of public access to a trial, however, is often a two-edged sword which may very well adversely affect a defendant's right to a fair trial. Accordingly, the right of the public and the press to attend court proceedings is not absolute (*Matter of Westchester Rockland Newspapers v Leggett*, *supra*, at 438; *Matter of New York Times Co. v Demakos*, 137 AD2d 247, 251) as the right to an open trial gives way, under certain circumstances, to other overriding rights or interests, such as an accused's right to a fair trial or the government's interest in avoiding the disclosure of sensitive information. Such situations, however, are rare and the reason for the closed proceeding must be for cause shown which, in a particular case, must outweigh the value of openness (*Waller v Georgia*, 467 US 39, 45; *Matter of Westchester Rockland Newspapers v Leggett*, *supra*, at 438; *Matter of New York Times Co. v Demakos*, *supra*, at 251).

The foregoing standards have been applied to civil court proceedings as well (*see, Rushford v New Yorker Mag.,* 846 F2d 249 [4th Cir]; *Westmoreland v Columbia Broadcasting Sys.,* 752 F2d 16 [2d Cir], *cert denied sub nom. Cable News Network v United States Dist. Ct.,* 472 US 1017; *see also, New Jersey Div. of Youth & Family Servs. v J.B.,* 120 NJ 112, 122, 576 A2d 261, 266). In *Globe Newspaper Co. v Superior Ct. (supra,* at 607), the United States Supreme Court recognized two interests favoring closure, the protection of minor victims of sex crimes from further trauma and embarrassment, and the encouragement of those victims to come forward and testify truthfully and credibly. The Court further agreed that the State's interest in safeguarding the well-being of a minor is a compelling one, but concluded that the determination of whether closure of any particular proceeding is necessary be made on a case-by-case basis (*supra,* at 608).

In *Press-Enterprise Co. v Superior Ct.* (464 US 501, 510, *supra),* the Supreme Court set forth the following applicable rules: "*The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values* and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." (Emphasis added; *see also, Globe Newspaper Co. v Superior Ct.,* 457 US 596, 606-607, *supra; Waller v Georgia, supra,* at 45; *Matter of Westchester Rockland Newspapers v Leggett, supra,* at 442.)

It is with these principles and constitutional concerns in mind that we turn to the matter at bar. Family Court Act § 1011 provides: "*This article is designed to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being.* It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met." (Emphasis added.)

A determination as to whether certain hearings may be closed to the public is governed by Family Court Act § 1043 which provides: "The general public *may be excluded* from any hearing under this article and only such persons and the representatives of authorized agencies admitted thereto as have an interest in the case." (Emphasis added.)

Uniform Rules for Trial Courts (22 NYCRR) § 205.4 delineates the criteria which the court must consider in determin-

ing whether access to Family Court proceedings is warranted. 22 NYCRR 205.4 (a) provides:

"In exercising the inherent and statutory discretion possessed by the judge who is presiding in the courtroom to exclude any person or the general public from a proceeding in the Family Court, the judge may consider, among other factors, whether:

"(1) the person is causing or is likely to cause a disruption in the proceedings;

"(2) the presence of a person is objected to by one of the parties;

"(3) the orderly and sound administration of justice, including the nature of the proceeding and the privacy of the parties, requires that all observers be excluded from the courtroom.

"Whenever the judge exercises discretion to exclude any person or the general public from a proceeding or part of a proceeding in Family Court, the judge shall make findings prior to ordering exclusion."

Under Family Court Act § 1043, the use of the phrase "may be excluded" indicates that closed hearings are not required, but are discretionary. However, the clear intent of this section is to safeguard the privacy of the children, as well as the parents, who are involved in these proceedings from the stigma of a public hearing (see, Family Ct Act § 1011; Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1043, at 380-382).

These guidelines "are meant to balance the right of access of the public and the press to judicial proceedings against the State's interest in protecting children from the possible harmful effects of disclosing to the public allegations and evidence of parental abuse and neglect" (Matter of Katherine B., 189 AD2d 443, 450).

In the matter before us, the Family Court failed to accord due consideration to the substantial evidence of potential harm to the children by press coverage of this proceeding and the public dissemination of certain aspects of their lives. In turn, the court gave undue consideration to the societal interest in understanding the workings of the Family Court and the child welfare system. An examination of the statutory criteria set forth in 22 NYCRR 205.4, as well as the constitutional issues which arise when a presumably public hearing is closed, compels the exclusion of the press in this case.

At the outset we note that while the Family Court concluded that the press had, thus far, not been disruptive to the proceed-

ings and had comported themselves in a professional manner, the court, in attempting to put some safeguards in place to protect the privacy of the children, stated that it would consider applications to exclude the press for those "brief portions of the testimony that only pertain to especially sensitive details not already in the public domain."

In the first instance, the Family Court's purported compromise is not adequate as there is simply no way of knowing in advance when such testimony may be elicited. This is compounded by the fact that once such evidence is introduced, the harm cannot be undone.

Moreover, the very procedure which the Family Court propounded would, in fact, continually disrupt the proceedings and result in an unduly protracted hearing. Indeed, in every instance in which the Law Guardian, the Commissioner of Social Services, or any other party sought to introduce sensitive testimony, an application for a stay of the proceeding would be necessary which would almost certainly be followed by a hearing, a ruling and then an appeal. The drawing out of the proceeding in this manner would in no way benefit the children and would, in fact, prolong the disruption of their lives.

The presence of the press would further disrupt and dilute the proceeding by influencing the Law Guardian as to what testimony she is able to present. The Ohio Supreme Court, in *In re T.R.* (52 Ohio St 3d 6, 20, 556 NE2d 439, 453, *cert denied sub nom. Dispatch Print. Co. v Solove*, 498 US 958), in regard to the presence of the press at a child custody proceeding, held that: "[C]oncern for the effect on [the child] would burden a lawyer's conscience as he questions the witnesses. A lawyer should be free of such extraneous conflicts of interest. * * * When the guardian must make strategic trial decisions based upon the potential psychological harm to his ward caused by the presence of the public, the fairness of the adjudication is endangered."

In conclusion, the Family Court's view that the press has thus far comported themselves in an orderly manner is a simplistic one in consideration of the wide ramifications of their presence in the courtroom during this proceeding.

With regard to the second criterion of 22 NYCRR 205.4, all four of the parties to the article 10 proceeding strenuously objected to the attendance of the press. The objections of the Law Guardian and the Commissioner of Social Services were firmly grounded in the law, and formidably supported by evi-

dence setting forth the enormous potential harm to the children if their privacy were further violated.

The third, and perhaps most significant criterion in this case, is the privacy of the parties concerned, specifically, the children. This concern is particularly crucial because the full names and ages of all five children, as well as photographs of three of the children, have already been disseminated by the media. Since the identities of these children are well known to the public, any further details concerning the children's family life, and the horror that they experienced, will be known to pertain to these particular children, even if their names were to be abbreviated or eliminated.

In two of the cases upon which the press places a great deal of reliance, the Family Court permitted the press to attend the article 10 proceeding under the strict condition that the press agree not to disclose the identity of the children involved, nor any information from which their identities could be ascertained (see, *Matter of Ulster County Dept. of Social Servs.*, 163 Misc 2d 373; *Matter of S. Children*, 140 Misc 2d 980).

The strict conditions imposed by the Family Courts in those cases evidence a resolve on the part of the courts to protect the privacy of the children concerned when such rights are placed in jeopardy by opening the courtroom to the press. The imposition of such conditions in the within action is impossible because the children's names and photographs have already been published. In cases such as this, when the identities of the children have already been released, the press has been excluded (see, *Matter of Katherine B.*, *supra*; *Matter of Robert M.*, 109 Misc 2d 427, 432 [where the Family Court excluded the press from a delinquency proceeding because "of the court's inability to shield the respondent and his family from public identification in connection with any damaging or sensitive facts that may be revealed at trial"]).

The only appellate decision in this State which addresses the issue of coverage by the media of an article 10 proceeding is *Matter of Katherine B. (supra)*. In *Katherine B.*, the child, who was 10 years old at the time of the incident, was kidnapped by an adult family friend and imprisoned in an underground dungeon in his home for 16 days, where he sexually abused her. Shortly after her rescue, a child protective proceeding was commenced against the child's mother, pursuant to article 10, on the grounds of neglect and abuse. The Law Guardian and the District Attorney thereafter joined in an application to close the courtroom to the public and the press, which was denied by the Family Court.

The Appellate Division, Second Department, reversed the Family Court upon the appeal of the Law Guardian and the District Attorney, and ordered the proceeding closed. The Court, in making its determination, considered an affidavit from the child's psychologist, as well as an affidavit from the child herself, and concluded: "Although Katherine B. requested in her affidavit that television cameras be barred from the courtroom (a request ultimately acceded to by the Family Court), her objection to press coverage is also reflected in that affidavit by her statement therein that 'It's BBAADD Enough that It's In The Papers'. Moreover, although the fact of her kidnapping and the allegations that she was sexually abused during her approximately 16 days in Esposito's home have received considerable publicity, *the precise details of her family life which preceded that unfortunate event have not yet been divulged, and they may well be explored in the underlying child protective proceeding.* Finally, the uncontroverted affidavit of Dr. Meltzer indicates that opening the courtroom to the public and press would 'revictimiz[e]' Katherine, and 'have a negative effect on her emotional well being' (22 NYCRR 205.4 [a] [2])." (*Matter of Katherine B., supra,* at 451-452 [emphasis added].)

Similarly, in the matter before us, there are affidavits by the children's psychologist and social worker which strongly and unequivocally indicate that allowing the courtroom to remain open to the public and the press would have a severe negative impact on the children's emotional well-being.

The specific factual details contained in the affidavits of the psychologist and the social worker which the Law Guardian and the Commissioner seek to keep confidential will not be discussed herein. It is worthy of note that both professionals have exceptional qualifications and extensive clinical experience working with and treating children who have been physically, sexually and/or emotionally abused. The conclusions of the experts, both of whom spent a great deal of time interacting with the two oldest children, Ruben and Kasey, echo each other in that they agree that the dissemination to the public of explicit details of the allegations made by the children would place them at even greater emotional risk than their present fragile state and would have a profound negative impact on their current and future therapeutic treatment. Both experts take pains to assure the court that they are not against the press/media in the courtroom per se, but that in this particular case, at this particular stage, with these specific children, further coverage will exact a severe emotional price.

Both the psychologist and the social worker averred, *inter alia*, that: the children's therapy would be severely undermined because of fears concerning the divulgement of information to the public; further emotional scarring would occur; and further erosion of family bonds and rejection of their parents would be inevitable. In addition, like *Katherine B. (supra)*, the evidence likely to be introduced is not necessarily already in the public domain or likely to enter the public domain as the result of the criminal prosecution of the mother. Also, like the circumstances presented in *Katherine B.*, the children have expressed a disdain for the coverage their lives have already received and a fear of future coverage and the resulting community and peer backlash. Specifically, the affidavits indicate that press coverage would undoubtedly exacerbate the children's anxiety and fear of rejection by friends, teachers and schoolmates, which would heavily impact on their sense of self-esteem. The affidavits conclude that further publicity concerning their lives could result in a "revictimization" of the children who are already emotionally fragile and would result in irreparable harm.

The press and the Family Court's attempt to distinguish the case at bar from *Katherine B. (supra)* and the press's claims that *Katherine B.* is contradictory to this Court's decision in *Anonymous v Anonymous* (158 AD2d 296) are unavailing. With regard to *Katherine B.*, nothing in the decision suggests that the petitioner's case was to be based exclusively on the testimony of the child, as the Family Court and the press urge.

However, even if it were assumed that Katherine B. did testify and that none of the children in the instant case will be called as witnesses, that would not render the decision in *Katherine B.* any less applicable to the present case. The Second Department's decision to exclude the press was not based on the ground that the child would be harmed by testifying publicly. Rather, the decision focused solely on the irreparable harm which would have been caused by the public exposure of the intimate and sensitive aspects of her life. As far as the children are concerned, whether the statements are revealed through their own testimony or through the mouths of others is of no consequence, as the experts have made clear it is the relevation of the circumstances which would cause the damage.

Finally, we do not find this Court's decision in *Anonymous (supra)* to be contrary to *Katherine B.* Initially, we note that *Anonymous* involved a child custody proceeding, which has

traditionally been open to the public, and not a child protective proceeding such as the one herein, which are traditionally closed (see, Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1043, at 380-383).

In any event, this Court found in *Anonymous* that the lower court did not abuse its discretion in denying the application to exclude the public and the press from the proceeding because "[t]he unsupported speculation by * * * counsel as to the deleterious effect that media coverage might have on the child is simply inadequate to overcome the strong presumption that court proceedings be open to the public" (*Anonymous v Anonymous, supra,* at 297).

In sharp contrast, both the case at bar and *Katherine B. (supra)* involve situations where the Law Guardians made compelling showings of the potential harm the children would suffer based upon the affidavits of treating psychologists and, in this case, the additional input of the children's social worker.

In conclusion, in light of the extraordinarily sensitive and personal nature of the information that will be addressed during the child protective proceeding, coupled with the strong evidence presented that publication of this information would be harmful to the children and the impossibility of protecting the children's right to privacy due to the previous disclosure of the children's identities, the record overwhelmingly demonstrates that the pending proceeding should be closed to the public and the press. Further, since all of the criteria compelling closure of the courtroom in a child protective proceeding were clearly and adequately established (see, Family Ct Act § 1043; 22 NYCRR 205.4), the Family Court erred in opening the proceeding to the media.

Accordingly, the order of the Family Court, New York County (Schechter, J.), which was entered on December 11, 1995, denying the Law Guardian's application to exclude the press from the pending article 10 proceeding, is unanimously reversed, on the law, the facts and in the exercise of discretion, without costs, the application is granted, and the proceeding is ordered closed to the public and the press.

MURPHY, P. J., ROSS and MAZZARELLI, JJ., concur.

Order, Family Court, New York County, entered on or about December 11, 1995, reversed, on the law, the facts, and in the

exercise of discretion, without costs, the application to exclude the press from the pending Family Court Act article 10 proceeding is granted, and the proceeding is ordered closed to the public and press.