Matter of S./B./B./R. Children (2006 NY Slip Op 51160(U))

[*1]

Matter of S./B./B./R. Children

2006 NY Slip Op 51160(U) [12 Misc 3d 1172(A)]

Decided on June 23, 2006

Family Court, Kings County

Freeman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 23, 2006

Family Court, Kings County
In the Matter of the S./B./B./R. Children, Alleged to have been abused by Nixzalie S.R. and Caesar R., Respondents.
06

For Administration for Children's Services, Ted Baron, Esq.
For Respondent Caesar R., Cindy Mendelson, Esq.
For Respondent Nixzalie S. R., Rick Stein, Esq.
Law Guardian for the Children, Grace Park, Esq.
For non-respondent father Carlos Cruz, Alina R. Rosenthal, Esq.
For newspaper interveners, David A. Schulz, Esq.

Nora Freeman, J.
Petitions alleging that respondents severely abused seven-year-old Nixzmary B., causing her death on January 11, 2006, were filed by the Administration for Children's Services ("ACS") in Family Court on January 13th. Representatives of the news media were present on January 16, the first day the respondents (the child's mother and step-father) were present in Family Court. At that time, ACS requested exclusion of the media from the courtroom, which was denied with leave to renew on papers.
An "Affirmation in support of closed hearing" (with several exhibits) was filed by ACS on January 27, 2006. The Court deemed the affirmation a motion for media exclusion and by order dated January 30, directed that ACS serve its affirmation (with extremely limited redactions in one exhibit) on the parties, non-respondent father of the child Javier, law guardian and any counsel representing news media who informed ACS and this Court of their request to be heard. The Court has now received, in addition to the original affirmation and exhibits, papers from the law guardian in support of the motion and from counsel representing Newsday, Inc., New York Times Company, NY Post Holding Inc., and Daily News, L.P. ("interveners") in opposition. On March 3, 2006, the Court requested additional information concerning the children's awareness of media coverage and their wishes, if they could be ascertained. ACS then submitted affidavits from a Social worker and two psychologists. The Court reserved decision, and now issues its ruling.[FN1]
It must be noted at the outset that ACS has modified its original position from seeking
complete exclusion of the media to a request that media be excluded only when the surviving
children's current needs are discussed. All five children were placed in temporary foster care
on January 11, 2006. Since January 12 they have been examined by medical and mental health doctors and are receiving various services, including individual therapy, to help them cope with their sister's death and their mother's incarceration. As the case is being prepared for trial, court appearances will focus on issues relating to each child's service needs, their visits with (and possible release to) family members, and their contacts (if any) with the respondents. The children's current needs are quite separate and distinct from the Family Court fact-finding hearing and the Criminal Court trial.
Family Court is a court of record, governed by the Family Court Act ("FCA") and subject to the Uniform Rules for the Family Court ("Rules"). The guiding provisions are FCA section 1043 and Rule 205.4 (22 NYCRR 205). Section 1043 (like sections 433, 531, and 741(b), relating to proceedings involving child support, paternity and "persons in need of supervision,"
respectively) merely provides that "the general public may be excluded from any proceeding under this article. . . ." Rule 205.4 provides specific guidelines for the exercise of the trial judge's discretion:
(a) The Family Court is open to the public. Members of the public,
including the news media, shall have access to all courtrooms, lobbies,
 public waiting areas and other common areas of the Family Court
 otherwise open to individuals having business before the court.
(b) The general public or any person may be excluded from a courtroom
[*2]
only if the judge presiding in the courtroom determines, on a case-by-case
 basis based upon supporting evidence, that such exclusion is warranted in
 that case. In exercising this inherent and statutory discretion, the judge may
 consider, among other factors, whether:
(1) the person is causing or likely to cause a disruption in the proceedings;
 (2) the presence of the person is objected to by one of the parties, including
 the law guardian, for a compelling reason; (3) the orderly and sound
 administration of justice, including the nature of the proceeding, the
 privacy interests of individuals before the court, and the need for protection
 of the litigants, in particular children, from harm requires that some or all
 observers be excluded from the courtroom; (4) less restrictive alternatives
 to exclusion are unavailable or inappropriate to the circumstances of the
 particular case. Whenever the judge exercises discretion to exclude any
 person or the general public from a proceeding or part of a proceeding in
 Family Court, the judge shall make findings prior to ordering exclusion
( c) When necessary to preserve the decorum of the proceedings, the judge
 shall instruct representatives of the news media and others regarding the
 permissible use of the courtroom and other facilities of the court, the
 assignment of seats to representatives of the news media on an equitable
 basis, and any other matters that may affect the conduct of the proceedings
 and the well-being and safety of the litigants therein.
(d) Audio-visual coverage of Family Court facilities and proceedings shall
 be governed by Part 29 of the Rules of the Chief Judge and Part 131 of the
 Rules of the Chief Administrator.
(e) Nothing in this section shall limit the responsibility and authority of the
 Chief Administrator of the Courts, or the administrative judges with the
 approval of the Chief Administrator of the Courts, to formulate and effectuate
 such reasonable rules and procedures consistent with this section as may
 be necessary and proper to ensure that the access by the public, including the
 press, to proceedings in the Family Court shall comport with security needs of
 the courthouse, the safety of persons having business before the court and
 the proper conduct of court business.
Published decisions explaining the bases on which judges have exercised their discretion
range from Fontana v. Fontana (194 Misc 2d 1062) a 1949 cases applying the predecessor statute to the Family Court Act, in which the judge stated exclusion of the public was necessary to protect the family from "the tabloids and neighborhood gossip," to the present. Expectations of privacy and the "sensitive nature" of family matters have, obviously, changed since enactment
of the Family Court Act in 1962. (For example, fathering or bearing a child out of wedlock, once viewed as shameful or scandalous, is now publicized by proud celebrity parents, or, in the case of "unknown" parents, scarcely noticed.) New York statutes continue to protect the identity of minors who are the victims of sexual offenses, however; see Civil Rights Law section 50-b(1). Several highly publicized tragedies have required the courts in recent years to weigh the [*3]competing interests of the privacy of child victims and the media/public's "right to know."
The appellate decisions in Matter of Katherine B, 189 AD2d 443 (2nd Dept. 1993) and
Matter of Ruben R, 219 AD2d 117 (1st Dept. 1996), lv. denied 88 NY2d 806 were governed by an earlier version of Rule 205.4, and are therefore deemed by the interveners to be inapplicable, or at least of diminished weight. The earlier version of the rule did not include a requirement that a less restrictive alternative to exclusion be considered, did not require findings by the court prior to ordering exclusion, and, perhaps most significantly, did not contain the language in current sub-paragraph (a) stating bluntly that "The Family Court is open to the public ... including members of the news media." The interveners argue that Rule 205.4 was interpreted by the appellate courts in 1993 and 1996 to establish discretion to allow access to proceedings that were historically or presumptively closed. The addition in 1997 of the new, explicit language in Rule 205.4(a) supports that interpretation. However, notwithstanding the different language in the Rules, the two appellate decisions in their entirety reflect a careful balancing of important competing interests, and this Court believes them to offer relevant guidance to application of the Rules today.
Katherine B presented facts similar to those in the case before this Court. Katherine, age ten, was reportedly abducted by a neighbor, held in captivity for ten days, and subjected to sexual abuse. The arrest and trials in Criminal and Family Courts were the subject of widespread, some would say sensational, coverage by print and video media, including publication of the child's full name and photograph. The trial judge who granted media access to the Family Court proceeding noted that
There is an important public and legislative education component
to proceedings open to public scrutiny which transcends individual
uneasiness and perhaps embarrassment in pursuing the truth of
discomforting issues in an open court. Enhancing public under-
standing of the works of its municipal offices is important if there
is to be public confidence in court proceedings."
 Matter of Katherine B, 189 AD2d at 446
In reversing Family Court's ruling, the Second Department noted that the evidence in support of a closed hearing included a written statement from the child herself ("I don't want people to know what happened to me because it's none of there bisines" [sic]), and an affidavit from a psychologist who had interviewed Katherine and reviewed the child protective agency case record, offering her opinion that exposing the child to media coverage "would constitute re-victimization" because she "evidences feelings of embarrassment and shame about what has happened to her, which are intensified and exacerbated by her knowledge that these facts are not private. Her awareness that the details of her life are subject to public disclosure has already caused her to avoid disclosing sensitive items of both the recent traumatic events of her life and her feelings. This will quite likely impact on her future therapeutic treatment and make success therein all the more difficult." The appellate court concluded that "the nature of the proceeding and the privacy rights of Katherine, clearly militate in favor of closure of the courtroom." ID., at 451. 
[*4]The facts in Ruben R are even closer to the present case. Those children were, like the children before this Court, siblings of a young child, Elisa Izquierdo, "whose brutal murder . . . shocked New York City, became world-wide news, and led to a reevaluation of the mechanisms which are designed to protect the welfare of the City's children." 219 AD2d 117, 118. Again, Family Court's ruling granting media access cited, among other considerations, the need to provide the public, through press coverage, with a better understanding of the "essential ... role of the Family Court in the child protective process," (Id., 121) and again the appellate court reversed. The First Department explicitly recognized in Ruben R that court proceedings are presumptively open, citing a Supreme Court ruling that "the presumption of openness may be
overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Id., at 123, citing Press-Enterprise Co. v. Superior Ct. 464 U.S. 501. The First Department undertook a balancing of interests, and
based its conclusion that closure was required on the affidavits from a psychologist and social worker ("professionals [of] exceptional qualifications and extensive clinical experience working with and treating children who have been physically, sexually and/or emotionally abused"), its
concern that the Law Guardian's advocacy on behalf of her clients might be compromised if
media coverage were permitted, the impossibility of protecting the children's identities, which were already widely publicized, and the difficulty in implementing a suggested procedure to
exclude the press only when "sensitive" matters would be discussed. The Court noted that the
privacy of the children was
perhaps the most significant criterion in this case . . .
particularly because the full names and ages of all five
children, as well as photographs of three of the children
have already been disseminated by the media. Since
the identities of these children are well known to the
public, any further details concerning the children's family
life and the horror that they experienced, will be known
to pertain to these particular children, even if their names
were to be abbreviated or eliminated. 
 Id., at 126.
The Court also noted that the professionals' affidavits "agree that the dissemination to the public of explicit details * * * would place them at * * * even greater emotional risk than their present fragile state and would have a profound negative impact on their current and future therapeutic treatment" and that "the children's therapy would be severely undermined because of fears concerning the divulgement of information to the public." Id., at 128. The Court accepted the professionals' assessment that "press coverage would undoubtedly exacerbate the children's
anxiety and fear of rejection by friends, teachers and schoolmates." Id.
Another First Department ruling in 1996 is Matter of PB v. CC, 223 AD2d 294, lv.
denied, 655 NYS2d 887 {89 NY2d 807} (1997), involving a custody proceeding in a family of well known child
actors. The appellate court, reversing the trial court's grant of media access, noted that the exercise of the court's discretion required a balancing of interests, and that
[*5]
It is to be remembered that we deal here not with the children's
"privacy," but with the protection and preservation of their
health and welfare. As we close courtrooms in criminal trials
on a regular basis, even in the face of the constitutional guarantee
of a public trial (U.S. Constitution, Amendment 6) and even over
the objection of one of the parties, in order to protect the
health and welfare of an adult police officer [citation omitted]
we should not hesitate to do so when those who are to be
protected are defenseless children. Id., 298.
The newspaper movants place great reliance on Anonymous v. Anonymous, 263 AD2d 341 (1st Dept. 2000), which was decided under the current Rule 205.4, and in which the appellate court reversed a trial judge's exclusion of the press. Anonymous was a matrimonial action
involving "well-known public figures of great wealth and prominence" (Id. at 342), in which the
trial court concluded that closure was necessary to protect the parties' four-year-old daughter.
The appellate court noted the "strong presumption of openness," and the need to "strike the
proper balance [between] the right of access of the public and the press to judicial proceedings [and] the * * * interest in protecting children from the possible harmful effects of disclosing {harmful information] to the public [citations omitted]" Id., at 343. After enumerating the four requirements under Rule 205.4, the appellate court concluded that the requisite showing for closure had not been made.
The First Department noted that "the questions at issue in this custody dispute are fairly common," including "details of religious issues, health care issues, financial, security issues, leisure time issues and general parenting issues," and a psychiatrist, although recommending media exclusion, had concluded that the four-year-old was "very healthy and handling the stress of [the] divorce with great resilience." Id., at 342. The Court found that "the possibility of some unspecified future harm does not constitute a compelling interest justifying closure" adding that
 The argument can always be made in any case that it is in the
child's best interest to shield her life from public gaze. Neither
Domestic Relations Law 235(2) nor the Uniform Rules for the
Family Court 205.4 contemplates such a result. Id.
 The Court went on, however, to contrast the custody trial involving a wealthy couple and their very healthy four year old with the children in Matter of Ruben R, supra , noting that in the latter case.
The child's death was the subject of intensive press scrutiny,
including a cover article in Time magazine. The mental health
experts who examined the children, who were, understandably,
already in a fragile state, agreed that public exposure of the
details concerning the "horrific and numbing" allegations of
abuse and neglect would result in "revictimization" of the children
and cause them to suffer irreparable harm. * * * The vague and
[*6]
conclusory speculations of psychological damage in this case
pale in comparison. Id at 345.
We turn now to the circumstances of the children before this Court, who, like those in Ruben R, are surviving siblings of a young girl allegedly brutally murdered by a parent, whose names and photographs have been published, who have become, as one expert put it, "disaster celebrities," and who are in need of intensive social work/mental health services to deal with what they have experienced and witnessed. The Court has received affidavits from the Law Guardian's social worker, Danielle Weisberg, LCSW; the two psychologists who are treating two of the children; and two affidavits from Elizabeth Roberts, a Deputy Commissioner at ACS, and also a licensed clinical social worker with more than twenty years of experience specifically involving child victims of domestic violence and abuse. The psychologists' affidavits are quite brief, failing to state how long they have treated the children, or what the children's diagnoses are. Each, however, offers an opinion that disclosure of those children's "sensitive treatment information" or "psycho-social or behavioral information" would be detrimental or harmful to the children. Ms. Weissberg, a social worker with more than ten years' experience with the Legal Aid Society working with abused/neglected children, bases her assessment on conversations with the children's foster parent and with their treating clinicians, as well as her personal observations of the children. She states, "it is evident that [the four eldest children] are all exhibiting symptoms consistent with those of children who have been severely traumatized," and notes that the children, having been interviewed by numerous professionals, all of whom question them about their sister's death and their own feelings, are showing signs of stress, "often not wanting to leave their foster home." She opines that "allowing the media access to sensitive details regarding the children's mental health will impede the therapeutic process by undermining the children's trust that statements made to their therapists will be kept confidential," and " will not only jeopardize [their] adjustment to foster care, but will compromise their ability to attend school, visit with their relatives and most importantly will undermine the mental health treatment that these children desperately need in order to move forward." (Exh. A to Law Guardian's affirmation). The two Roberts affidavits indicate that Ms. Roberts has not personally observed/interviewed/treated any of the children, but her considerable experience as both a treating clinician and program administrator lend credibility to her views, which are based on her continuing, frequent consultations with the children's treatment/service teams. Ms. Roberts emphatically recommends that Nixzmary's siblings not be exposed to media scrutiny of their current problems and services, agreeing with Ms. Weissberg that such exposure will undermine the therapeutic efforts on their behalf.
This Court has reviewed the four factors specified in Rule 205.4. No one is claiming that
members of the media have caused a disturbance in the courtroom, but both ACS and the Law
Guardian oppose media presence for compelling reasons: the vulnerability of the children to
further unwelcome publicity, in particular, revealing their current adjustment and needs. The
third factor, explicitly recognizing "the need for protection of the litigants, in particular, children, from harm," has been addressed by the social workers/psychologists' affidavits. Finally, there
does not appear to be a "less restrictive alternative to exclusion" in a case in which the children's names, ages, and faces have been published. The Court has pondered whether the children's
[*7]
identities could be concealed by use of pseudonyms. However, allowing the press to learn that
an unnamed child is suffering, for example, from night terrors, or bed-wetting, or needs psychiatric care, simply means that all of the children will be at risk of being labeled, ridiculed, shamed. These young children have lost a sister under devastating circumstances. They have lost any hope of a "normal" childhood, let alone a happy one. Recognizing the strong presumption in favor of open hearings, and having balanced the constitutional and statutory rights of the press with Family Court's obligation to protect, as best it can, innocent children who find themselves under its jurisdiction, this Court concludes that media presence at court proceedings relating to the children's current services plans is against their interest and should not be permitted.
This Court recognizes the obligation of the media to report accurately on issues of compelling public interest, including the safety of children and the efforts, whether successful or not, by public entities, including ACS and Family Court, that are charged with their protection. However, the Court finds no constitutional or statutory authority, and no binding appellate precedent, requiring that the privacy interests of these particular identified children, their mental health and welfare, should be compromised by exposing their personal circumstances to media attention. Accordingly, the motion by ACS, joined by the Law Guardian, to exclude the media from courtroom discussions of the children's current service needs, is granted.
Finally, the Court notes the profound complexity and challenges in a city of eight million people from varied cultures, of providing adequate protection to vulnerable children while respecting the privacy and cultural values of their parents, of providing immediate response to crises while protecting due process rights. The media's obligation to provide the public with accurate information concerning the work of ACS and Family Court can be met by coverage of the hundreds of truly "anonymous" child protective cases filed each year. (During the one month period, April 24, 2006 through May 21, 2006, 294 new child protective petitions were filed in the Brooklyn Family Court.) Such coverage would undoubtedly require a long-term and substantial commitment by reporters of time and resources, but would ultimately lead to a greater understanding by the public of the resources necessary to protect children, day after day, week after week. This Court is unaware of any such media commitment, but would be happy to cooperate, if requested.
 This constitutes the Decision and Order of the Court. Copies of this Decision shall be mailed to all counsel.
Dated: June 23, 2006
Brooklyn, New York
ENTER
_______________________________________
Hon. Nora Freeman, J.F.C.

Footnotes

Footnote 1: The media's request for intervener status and an opportunity to be heard were granted without opposition.