[711 NYS2d 419]

DANCO LABORATORIES, LIMITED, Respondent, v CHEMICAL
WORKS OF GEDEON RICHTER, LIMITED, Respondent. WASH-
INGTON POST COMPANY, Intervenor-Appellant.

First Department, July 27, 2000

### APPEARANCES OF COUNSEL

*Lorin L. Reisner* of counsel (*P. Bradley O'Neill* and *Eric Lieberman* on the brief; *Debevoise & Plimpton,* and *The Washington Post Company,* attorneys), for intervenor-appellant.

*Michael L. Stern* of counsel (*Edwin M. Mulholland* on the brief; *Law Office of Michael L. Stern & Associates,* and *Mulholland & Knapp,* attorneys), for respondent.

*Peter Richard Bisio* of counsel (*John E. Beerbower* on the brief; *Cravath, Swaine & Moore,* and *Hogan & Hartson,* attorneys), for respondent.

### OPINION OF THE COURT

Tom, J.

This proceeding was brought by the Washington Post Company as intervenor in the underlying action. The Post's intervention arises from its journalistic interest in obtaining information from court records regarding the possible distribution and sale in the United States of the controversial so-called abortion pill, RU-486. The information has obvious newsworthy qualities, as can be seen from the brief summary below, but its disclosure purportedly will reveal trade secrets and the identities of persons who then may be targeted for harassment or violence. For these reasons, Supreme Court, upon motion,

sealed the record, a decision with which both plaintiff and defendant agree. This appeal, by the Post, is from that order.

The drug Mifepristone, also known as RU-486, is an oral contraceptive with abortifacient properties. The ingestion of this pill can induce abortion. Mifepristone was invented and patented by the German company, Hoechst AG. It was originally manufactured and distributed in France and elsewhere by a French company, Roussal Uclaf, in which Hoechst held a majority stake. RU-486 has been manufactured in Europe for approximately 10 years and has been sold in France, Sweden and the United Kingdom.

Nonparty Population Council, Inc. is a New York not-for-profit organization involved in research activities that advance women's reproductive health and rights. In 1994, Population Council obtained from Hoechst/Roussal the United States patent rights to RU-486. The drug is currently before the Food and Drug Administration for approval for use in this country. Defendant Chemical Works of Gedeon Richter, Limited is a Hungarian drug manufacturer. Population Council had a September 15, 1995 letter agreement with Gedeon Richter providing for Gedeon Richter's bulk manufacture and sale of the abortion pill to Population Council's licensees and sublicensees. Plaintiff Danco Laboratories, Limited, a sublicensee of Population Council, entered into a contract with Gedeon Richter, also dated September 15, 1995, that provided for Gedeon Richter to manufacture the drug in bulk form, which would be reduced to pill form by another manufacturer for Danco's distribution and sale. Danco subsequently commenced the underlying action in breach of contract and various tort theories when Gedeon Richter failed to manufacture RU-486.

By 1998, Population Council had been working through the Danco Group to raise investment funds for marketing. Danco was not a manufacturer, though (*see*, Seelye, *House Votes to Block F.D.A. On Approval of Abortion Pill,* New York Times, June 25, 1998, section A, at 20, col 5). It apparently found a new manufacturer after Gedeon Richter discontinued its involvement (*see*, Benac, *Abortion Pill Far From U.S. Market,* AP Online, July 18, 1998), which raises the issue of protecting identities. Population Council is not a pharmaceutical company and must license bulk manufacturing, "tableting," and distribution to other companies (Zitner, *What ever happened to the saga of RU-486?,* Boston Globe, Nov. 23, 1997, magazine section, at 18). Apparently, other groups, such as the Abortion Rights Mobilization, relying on a provision of law that allows

copying the drug for "research" purposes, seek to clandestinely manufacture and distribute the drug to abortion clinics. Although the public patent contains general information about how the drug is made, it need not contain all technical information, so a nonlicensed manufacturer faces the additional risks and expense of conducting its own laboratory work and clinical trials. Apparently, the Abortion Rights Mobilization has succeeded but others have not (Zitner, *id.*), hence, we are presented with a trade secrets issue.

In the meantime, the Washington Post entered the picture with its coverage of the present breach of contract litigation, reporting that plaintiff Danco was seeking to require Gedeon Richter, the pharmaceutical manufacturer, to manufacture the drug but that other manufacturers, as yet unidentified, also were being considered (*see*, Murphy, *Abortion Pill's U.S. Sponsor Suing Hungarian Drug Firm,* Washington Post, June 12, 1997, section A, at 3). The Post article reported that Gedeon Richter's participation was very important to bringing the drug to market, underscoring the public importance of coverage of the litigation, but again underscoring the competing need to prevent disclosure of individual names.

The merit of the underlying litigation is not presently relevant. Rather, we narrow our focus to whether the record should be sealed and, if so, how much of it. As noted, plaintiff and defendant, both of which submit affidavits and related materials attesting to security concerns, seek sealing. The Washington Post, characterizing the security and trade secrets concerns to be vague and unsubstantiated, argues that no good cause has been shown for the sealing order and, at the least, total sealing cannot be sustained in view of the public importance of the information.

Supreme Court first addressed the application to seal the record in a decision dated June 2, 1997. The court found no showing of good cause to seal the record and indicated that requested-for nondisclosure of trade secrets would be entertained as such issues arose. However, by subsequent order dated July 30, 1997, the court entertained Danco's subsequent motion for a preliminary injunction and, effectively reversing itself, thereupon ordered that the record be sealed. However, from June 2 to July 30, the period during which the Post's article was published, the records appear to have been available to the public. By notice of motion dated October 24, 1997, the Post moved to intervene and, upon intervention, to vacate that order. By order entered June 5, 1998, the court denied

both branches of the motion. The court's decision stated generally that the need to protect trade secrets and the identities of financial backers outweighed the interest of the public in the information sought, and exercised its discretion to seal the entire record rather than to attempt to redact large portions of it. We modified that order in our December 8, 1998 order, granting intervention and remanding for Supreme Court to detail the grounds underlying its finding of good cause under 22 NYCRR 216.1 justifying sealing and the extent thereof (256 AD2d 62). We did not take issue with the finding that there are security and trade secret concerns in this case that warrant a degree of nondisclosure, but obviously disagreed with the court's conclusory sealing of the entire record. By order entered on or about June 23, 1999, presently under review, Supreme Court basically adhered to its position. Its general finding of good cause was illustrated by newspaper articles and the like posing ostensible threats against those involved in providing or facilitating abortions—again, a general finding that we accept—but again simply found that these circumstances justified a complete sealing. What we had expected was a detailed explanation of why the entire record had to be sealed rather than particular portions of it. We received the same ruling, omitting a detailed analysis of the record that prompted our order remanding for specific findings. For the following reasons, we now modify and find it necessary to direct that a mechanism be established to redact the record.

The larger picture of an otherwise obscure commercial dispute includes the obvious political and social clashes that arise in connection with abortion and its methodology. In this regard, Supreme Court acted to shield the identities of persons involved in the business dispute at the heart of this action. That larger picture, though, also includes the factor of competition for the capability to devise and market a medical product such as RU-486 that, by shifting the public debate to a less traumatic, nonsurgical terrain, only opens another avenue of contention for this fundamentally intractable public issue. As various newspaper articles submitted with the appellate record suggest, the greater ease of an abortion afforded by the availability of RU-486 will likely raise the stakes for pro-life opponents. However, this very quality of convenience also raises the economic stakes for parties seeking to maintain control of the market. Hence, not only the need to shield identities is in issue but, also, the need to protect trade secrets. The sealing order under review accomplishes those ends, but, in view of

the public importance of the underlying dispute, the order was overbroad and violates our well-established judicial regard for ensuring public access to nonconfidential court records. Rather, disclosure with appropriate redaction would have more discretely accomplished the protective as well as informational ends of the parties.

We start by taking note of the broad constitutional proposition, arising from the First and Sixth Amendments, as applied to the States by the Fourteenth Amendment, that the public, as well as the press, is generally entitled to have access to court proceedings. Since the right is of constitutional dimension, any order denying access must be narrowly tailored to serve compelling objectives, such as a need for secrecy that outweighs the public's right to access (*Globe Newspaper Co. v Superior Ct.*, 457 US 596, 605-607 [articulated in context of criminal trial; rape case]). However, the right of access is not absolute. Moreover, access may still be respected in keeping with constitutional requirements while sensitive information is restricted in keeping with "the State's legitimate concern for the well-being" of an individual (*Globe Newspaper Co. v Superior Ct.*, at 609). The media's right of access and the public's right of access are on the same footing (*Republic of Philippines v Westinghouse Elec. Corp.*, 949 F2d 653, 659). The right of access to proceedings as well as to court records is also firmly grounded in common-law principles (*Nixon v Warner Communications*, 435 US 589, 597; *Brown & Williamson Tobacco Corp. v Federal Trade Commn.*, 710 F2d 1165, 1179, *cert denied* 465 US 1100; *Republic of Philippines v Westinghouse Elec. Corp., supra*, at 659), although a different analysis applies when applying the right of access under these respective bases. The existence of the correlating common-law right to inspect and copy judicial records is "beyond dispute" (*In re National Broadcasting Co.*, 635 F2d 945, 949).

The issue often arises in the context of criminal proceedings, but both the First Amendment and common law principles apply equally to civil proceedings (*Republic of Philippines v Westinghouse Elec. Corp., supra*, at 660; *Matter of Herald Co. v Weisenberg*, 59 NY2d 378, 383; *see also*, Comment, *The First Amendment Right of Access to Civil Trials After Globe Newspaper Co. v Superior Court*, 51 U Chi L Rev 286 [1984]). As the United States Supreme Court has noted, "[w]hile the operation of the judicial process in civil cases is often of interest only to the parties in the litigation, this is not always the case. * * * Thus, in some civil cases the public interest in access, and the

salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases" (*Gannett Co. v DePasquale*, 443 US 368, 386-387, n 15). Among the values of access in civil cases is that "the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness" (*Republic of Philippines v Westinghouse Elec. Corp.*, *supra*, at 660; *Littlejohn v BIC Corp.*, 851 F2d 673, 678). Publicity about trials "tend[s] to insure that the truth will be told and the secrecy of inquisition-like proceedings will not occur" (*Coopersmith v Gold*, 156 Misc 2d 594, 601; *see*, *Matter of Westchester Rockland Newspapers v Leggett*, 48 NY2d 430, 437-438). The public interest in openness is particularly important on matters of public concern, even if the issues arise in the context of a private dispute (*Brown & Williamson Tobacco Corp. v Federal Trade Commn.*, *supra*, at 1179), about which secrecy, then, may well prove the greater detriment to the public (*see generally*, Doggett and Mucchetti, *Public Access to Public Courts: Discouraging Secrecy in the Public Interest*, 69 Tex L Rev 643, 648 [1991]). Nor is the right of access limited, under a common-law analysis, only to materials submitted in connection with dispositive motions, or to trials; it applies equally to materials supplied for preliminary motions (*Republic of Philippines v Westinghouse Elec. Corp.*, *supra*, at 661; *Cianci v New Times Publ. Co.*, 88 FRD 562, 564). The common-law presumption of access, as applied to the inspecting and copying of court records, is "especially strong" for "any item entered into evidence at a public session of the trial" (*In re National Broadcasting Co.*, 635 F2d 945, 952, *supra*) although, again, it is not absolute (*Coopersmith v Gold*, *supra*; *Matter of Crain Communications v Hughes*, 135 AD2d 351, *affd* 74 NY2d 626, *rearg denied* 74 NY2d 843 [application to unseal record; claim regarding trade secrets offered in opposition]).

In New York, too, we have stated that "statutory and common law * * * have long recognized that civil actions and proceedings should be open to the public in order to ensure that they are conducted efficiently, honestly and fairly" (*Matter of Brownstone*, 191 AD2d 167, 168). New York's presumption of public access is broad (*Matter of Newsday, Inc. v Sise*, 71 NY2d 146, 153, n 4, *cert denied* 486 US 1056; *Matter of Herald Co. v Weisenberg*, 59 NY2d 378, 381-382, *supra*; *see*, Carpinello, *Pub-*

*lic Access to Court Records in Civil Proceedings: The New York Approach,* 54 Alb L Rev 93 [1989]). We have required that a "legitimate basis" justify the sealing of court documents (*Matter of Brownstone, supra,* at 168). Pursuant to these general policy objectives, New York promulgated Uniform Rules for Trial Courts (22 NYCRR) § 216.1 (a). This section directs that "[e]xcept where otherwise provided by statute or rule, a court shall not enter an order in any action * * * sealing the court records, whether in whole or in part, except upon a written finding of good cause, which shall specify the grounds thereof. In determining whether good cause has been shown, the court shall consider the interests of the public as well as of the parties" (22 NYCRR 216.1 [a]). Although the rule does not further define "good cause," a standard that is " 'difficult to define in absolute terms,' " a sealing order should rest on a " 'sound basis or legitimate need to take judicial action,' " a showing properly burdening the party seeking to have a sealed record remain sealed (*Coopersmith v Gold,* 156 Misc 2d 594, 606, *supra*). We also have recognized that the right of access asserted by the media is not absolute (*cf., Matter of Crain Communications v Hughes, supra*). Hence, under common law and by rule in New York, redaction is a viable option, predicated upon the required level of need.

With these principles as our guide, we agree that Supreme Court's written decision establishes good cause for limited protection in a general sense. However, its failure to target precise areas where redaction should occur violated section 216.1 (a). The public's interest in whether RU-486 will be manufactured and distributed is fairly apparent, certainly legitimate, broadly based and is motivated by more than "mere curiosity" (*Matter of Crain Communications v Hughes, supra,* at 352). Especially when issues of major public importance are involved, the interests of the public as well as the press in access to court records "weigh heavily" in favor of release (*In re National Broadcasting Co., supra*). The alternative, one that Supreme Court's order accommodates, is a secret trial on a matter of significant public importance.

The Post purports not to seek disclosure of "genuine" trade secrets. In camera review and appropriate redaction is a valid method of protecting trade secrets when a movant seeks to seal an entire case file (*see, e.g., Pratt & Whitney Canada v United States,* 14 Cl Ct 268, 275; *In re Iowa Freedom of Information Council,* 724 F2d 658, 664). The identities of persons legitimately exposed to violence may similarly be protected, a general point also conceded by the Post.

In directing that these matters be specifically addressed by appropriate redaction, we aim to strike the proper balance. That still leaves the issue, though, of prospective relief: that is, as to information that will be generated, and may require protection, as the case proceeds. The Post's opponents, suspicious of its use of adjectives such as "genuine" to qualify its acquiescence in redaction, point out that genuineness seems inherently factual and poses the potential for constant determinations. However, this underlying dispute concerns breach of contract, involving whether Gedeon Richter inexcusably refused to perform a promise to manufacture, and this does not readily lend itself to the actual mechanics of the manufacturing processes. As such, we would not anticipate that occasional decisions by the trial court whether particular information is likely to reveal a trade secret will prove unduly burdensome.

Redaction of identities is likely to occur more often, especially as discovery proceeds. Although the number of identities may well exceed the number of trade secrets requiring protection, we would anticipate that the showing of need for the protection will be less complicated. Basically, the parties to the action may seek redaction of the identities of persons involved in the manufacturing and marketing of RU-486. Given Supreme Court's clear sensitivity to the need, we are confident that it will exercise appropriate discretion. Here, we take into account the Post's representation that it will not object to redaction upon a showing of need.

However, we also anticipate that in the aggregate, the process of handling issues as they arise could become unwieldly and detract from the court's over-all supervision of pretrial proceedings and the trial itself. As such, we direct Supreme Court to appoint a Special Referee to entertain motions in connection with prospective redaction of trade secret information or identities as they arise, and to report back to that court with recommended dispositions.

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered on or about June 28, 1999, which denied the Post's motion to vacate the sealing order, should be modified, on the law, to the extent of remanding to Supreme Court, New York County for appointment of a Special Referee, for redaction of any and all information relating to trade secrets and individual persons named in the court file who are directly involved in the manufacturing or distribution of RU-486, and otherwise affirmed, without costs.

WILLIAMS, J. P., RUBIN and ANDRIAS, JJ., concur.

Order, Supreme Court, New York County, entered on or about June 28, 1999, modified, on the law, to the extent of remanding to Supreme Court, New York County for appointment of a Special Referee, for redaction of any and all information relating to trade secrets and individual persons named in the court file who are directly involved in the manufacturing or distribution of RU-486, and otherwise affirmed, without costs.