OPINION OF THE COURT
Kristin Booth Glen, J.
ERJ, respondent in a proceeding to vacate her adoption of John Doe, a four-year-old Cambodian orphan, has moved to close the courtroom during a hearing on foreign law.[1] LMB, movant in the underlying proceeding, opposes the motion.[2]
The focus of the hearing is narrow: do the essentially identical “Adoption Permission Certificates” issued by the Cambodian government to LMB on June 23, 2004, and to ERJ on October 11, 2005, constitute a completed adoption, as ERJ claimed in her petition for the readoption of John Doe,[3] or merely a permission to adopt in a foreign country, as she claims now? Determination of this limited issue may avoid the necessity of a further hearing on more personal matters relating to the challenged *716 adoption. In addition, the issue is of considerable general interest, as well as of particular interest to persons who have obtained and relied upon similar certificates to establish the adoptive status of their Cambodian children.
Constitutional, Judicial and Legislative Affirmation of Public
Trials
Public trials are a hallmark of our judicial system (see Richmond Newspapers, Inc. v Virginia, 448 US 555 [1980]). The rationale is set forth in an oft-cited quote by Justice Holmes:
“It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.” (Cowley v Pulsifer, 137 Mass 392, 394 [1884].)
The First Amendment right of access to criminal trials applies equally to civil trials (e.g. Danco Labs. v Chemical Works of Gedeon Richter, 274 AD2d 1, 6-7 [1st Dept 2000]). In addition to the general reasons propounded by Justice Holmes, open trials “enhance the integrity and quality of what takes place” (Richmond Newspapers, Inc. v Virginia, 448 US 555, 578, supra [1980]), and make it more likely that witnesses will testify truthfully.[4]
The presumption of an open trial is codified in the Judiciary Law:
“The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, criminal sexual act, bast *717 ardy[5] or filiation, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court.” (Judiciary Law § 4 [emphasis added].) [6]
In the realm of family law, the Legislature has carved out additional exceptions to those found in the Judiciary Law, namely: custody proceedings (Domestic Relations Law § 235 [2]), support proceedings (Family Ct Act § 433 [a]), paternity proceedings (Family Ct Act § 531), proceedings concerning whether a person is in need of supervision (Family Ct Act § 741 [b]), and child protective proceedings (Family Ct Act § 1043).[7] In addition, a more limited exception has been created in adult *718 guardianship cases (Mental Hygiene Law § 81.14).[8] Neither Judiciary Law § 4 nor any other provision of the Domestic Relations Law or the Family Court Act provides judicial discretion for excluding the public from adoption proceedings.
Accordingly, it is questionable whether it is even permissible to exclude the public from an adoption proceeding, despite the almost uniform practice by which this has become an “unofficial rule.” The parties have cited no “closure” case involving adoptions,[9] nor, in the limited time since this motion was submitted on March 16, has the court found any such case.[10]
It also is questionable whether Uniform Rules for Family Court § 205.4 (b) — containing guidelines for a court to consider in exercising its “inherent” and statutory discretion to exclude the public from a courtroom — has application in a proceeding to vacate an adoption. That is: can an administrative rule create an exception to section 4 of the Judiciary Law?
The court need not reach that potentially constitutional question. Even under Uniform Rules for Family Court § 205.4 (b)— which the parties agree applies[11] —respondent fails to overcome the strong presumption of an open court.
Section 205.4 (b) of the Uniform Rules for Family Court provides:
“(b) The general public or any person may be excluded from a courtroom only if the judge presiding in the courtroom determines, on a case-by-case basis based upon supporting evidence, that such exclusion is warranted in that case. In exercising *719 this inherent and statutory discretion, the judge may consider, among other factors, whether:
“(1) the person is causing or is likely to cause a disruption in the proceedings;
“(2) the presence of the person is objected to by one of the parties, including the law guardian, for a compelling reason;
“(3) the orderly and sound administration of justice, including the nature of the proceeding, the privacy interests of individuals before the court, and the need for protection of the litigants, in particular, children, from harm, requires that some or all observers be excluded from the courtroom;
“(4) less restrictive alternatives to exclusion are unavailable or inappropriate to the circumstances of the particular case.”
Judicial exegesis, especially after the ringing reaffirmation of our courts’ commitment to open proceedings in the 1997 amendment to section 205.4, has made clear that the presumption of an open courtroom is not easily overcome, even when “protection of children” is invoked, lest the exception swallow the rule (see Anonymous v Anonymous, 263 AD2d 341, 342 [1st Dept 2000], supra).
The Presumption of an Open Courtroom and the Compelling
Interest Test
It is well settled that, because judicial proceedings are presumptively open, closure requires compelling circumstances (e.g. Matter of Herald Co. v Weisenberg, 89 AD2d 224, 226 [4th Dept 1982]). This is equally true in the various domestic relations proceedings governed by section 205.4. (See e.g. Matter of Kent v Kent, 29 AD3d 123, 135 [1st Dept 2006] [in which the Court stated: “This fundamental rule of public access to judicial proceedings applies equally to matters heard in Family Court (see 22 NYCRR 205.4 [a])”].) However, “this right is not absolute and may be limited upon a finding that compelling interests justify closure or partial closure.” (Matter of Kent v Kent, 29 AD3d 123, 135-136 [1st Dept 2006], supra; accord Anonymous v Anonymous, 263 AD2d 341, 342 [1st Dept 2000], supra.)
A court presented with a request for closure under section 205.4 must therefore balance the heavy interests of the public, press, and society generally in an open trial against the harm *720 that an open courtroom may cause to children. A court may find against the presumption only when evidence of that harm, or potential harm, is compelling. This in turn requires examination both of the severity of the harm and the quantum of evidence that is real, concrete and specific. It is in this light that respondent’s allegations must be considered.
In addition, and as discussed infra, the weight of public, as opposed to merely private or prurient, interest in the trial must also be placed on the scale to determine whether closure should be permitted.
Respondent’s Contentions
In her affidavit in support of this motion, respondent requests closure[12] for two reasons: First, she argues that because she, and to a lesser extent, LMB, have some notoriety, it is likely the media might report on the facts and testimony adduced at the hearing, or, as she writes, “the likelihood that sensitive information would be reported about the case in general — and about [John Doe] in particular — would be very strong.” Second, she writes, “[m]y request ... is prompted by my deep concern about the emotional harm I believe [John Doe] could sustain as a result of publicity attending this case” (emphasis added), noting that “the nature of the developmental and psychological risks an open courtroom would pose to [John Doe] are elaborated in [an] accompanying affirmation of Dr. Rodrigo Pizarro, a child psychiatrist.” She goes on to state that “[m]ost urgently, I am concerned that [John Doe] not learn that he was adopted from the media or third parties.”
Dr. Pizarro, a board certified child psychiatrist with a private and forensic practice, has submitted a lengthy affidavit, filled with general views about identity formation, the need of children to form coherent self-narratives, the risks, especially for abandoned and adopted children of insecure attachment, and the greater vulnerability of adoptive children to psychological stress, problems and disorders.[13] Notably, however, he admits that he has never met or even observed John Doe, or any of the *721 parties, and that he has formed an opinion that publicity from this case might be harmful based entirely on a hypothetical.[14] His affirmation is therefore couched, appropriately under the circumstances, in “coulds,” “mights,” or “is likelys.”[15]
The Nature and Severity of the Harm
Respondent’s concerns, while understandable and no doubt heartfelt, fall far short of the standard set by case law under section 205.4.
With one exception,[16] the cases cited by the parties in which appellate courts have permitted or required closure were Family Court child protective proceedings. They involved children who were the victims of abuse, harm or violence,[17] usually by parents,[18] such that, in their particular circumstances, publicity about the facts of the case would almost certainly cause them to *722 be “re-victimized” (Matter of Ruben R., 219 AD2d 117, 128 [1st Dept 1996], supra), with all of the attendant harm that would entail. In those cases, the public’s (and the press’) right to access was insufficient to trump the compelling interest of the state “in protecting children from the possible harmful effects of disclosing to the public allegations and evidence of parental abuse and neglect.” (Matter of Katherine B., 189 AD2d 443, 450 [2d Dept 1993], supra.) Unlike the traumatic circumstances of those cases, John Doe is not alleged to have suffered any harm to date, nor are there any allegations of abuse or neglect in this proceeding. The hearing that respondent seeks to close is limited solely to an issue of foreign law.
Matter of P.B. v C.C. (223 AD2d 294 [1st Dept 1996], supra), the decision relied upon most heavily by respondent, is entirely distinguishable based upon the alleged harm, as well as on a number of additional grounds discussed below.[19] In that case, the Appellate Division closed the courtroom in a custody trial *723 pursuant to Domestic Relations Law § 235 and section 205.4.[20] Six children were involved in their parents’ highly publicized divorce proceeding, two of whom were well-known child actors. All parties sought closure for the children’s protection, and extensive evidence of past and future harm was offered. The Appellate Division analogized the situation, in which “[njumerous . press reports concerning this case have already revealed allegations of alcohol and drug abuse and domestic violence,” to two proceedings — Matter of Ruben R. (219 AD2d 117 [1st Dept 1996], supra) and Matter of Katherine B. (189 AD2d 443 [2d Dept 1993], supra) — in determining that the custody proceeding should be shielded from the press. (Matter of P.B. v C.C. at 296.) Significantly, the Court found that, “[a]s in both Ruben R. and Katherine B., the emotional and educational harm which has already occurred has been explicitly documented” (id. at 296-297 [emphasis added]). And, the Court noted, based on the extensive, specific, concrete proof submitted, “we deal here not with the children’s ‘privacy’, but with the protection and preservation of their health and welfare” (id. at 298).
By contrast, the potential harm alleged in this case is far more like that in the ordinary contested custody case, which the Appellate Division has firmly rejected as a basis for closure under Domestic Relations Law § 235 (2).[21] The claim that publicity and exposure of intimate family details may be harmful to children in a celebrity divorce case prompted now Presiding Justice Tom, writing for the Court, to note:
“If a custody trial can be closed to the public on the *724 showing made here[22] then closure of the courtroom would be the rule, not the exception, in custody cases. The argument can always be made — in any case — that it is in the child’s best interest to shield her life from public gaze. Neither Domestic Relations Law § 235 (2) nor Uniform Rules for Trial Courts § 205.4 contemplates such a result.” (Anonymous v Anonymous, 263 AD2d 341, 344 [1st Dept 2000], supra; accord Merrick v Merrick, 154 Misc 2d 559 [Sup Ct, NY County 1992] [declining to close courtroom in celebrity divorce case despite allegations that publicity could be harmful to parties’ older daughter and two younger adoptive children]; Sprecher v Sprecher, NYLJ, June 21, 1988, at 21, col 6, affd sub nom. Anonymous v Anonymous, 158 AD2d 296 [1st Dept 1990] [affirming trial court’s refusal to close the courtroom in a highly publicized custody trial where, it was alleged, teachers, other children and parents were treating the child differently as a result of the publicity that she was being raised by Sullivanians, and modifying only to the extent of requiring an “anonymous” caption]; cf. Anonymous v Anonymous, 27 AD3d 356, 361 [1st Dept 2006] [in “child custody (cases) such relief (use of anonymous captions) should be granted only in the rare case, where, in considering the best interests of the children, there is a finding that their health and welfare would be protected, not their ‘privacy’ ” (citations omitted)]).
Respondent’s expressed fear — that John Doe may learn of his adoptive status from someone other than herself[23] —is not the kind of “damaging information” about abuse and/or violence *725 from which the court may act to protect children. The fact of adoption is hardly stigmatizing in this day and age[24] especially in cosmopolitan New York City where, in particular, the adoption of Asian children has become commonplace.[25]
Four-year-old John Doe is presumably unable to read any press coverage that might ensue. While respondent points out that he attends preschool with 19 other children and a staff of five adults, there is neither certainty that those individuals will learn about the trial, nor, if they do, that they will communicate their knowledge to John Doe.[26] It is also likely that John Doe, a Cambodian child who speaks Khmer to his Cambodian nanny and English to the rest of the members of his household, already has some knowledge of his difference, if not his precise status. Finally, it is wholly within respondent’s power to share this information with John Doe in lieu of the possibility that he might learn it from others.[27] Proof of Harm
In addition to the severity or kind of harm that might result from an open courtroom, the courts also have carefully scrutinized the kind of proof offered to demonstrate such harm, eschewing allegations that are speculative and/or not concretely grounded in personal (and often professional) observation of the child’s situation and response to prior publicity (see Merrick v Merrick, 154 Misc 2d 559 [Sup Ct, NY County 1992], supra).
In each of the cases in which closure of the courtroom was granted, the court took note of and accepted the direct clinical
*726 evidence offered by mental health professionals and social workers of severe trauma and damage to the mental health of the children. (E.g., Matter of S./B./B./R. Children, 12 Misc 3d 1172[A], 2006 NY Slip Op 51160CU], *6-7 [2006] [court received affidavits from law guardian’s social worker, two psychologists treating two of the children, and other professionals]; Matter of Ruben R., 219 AD2d 117, 127 [1996] [affidavits were provided by the children’s psychologist and social worker, both of whom had “spent a great deal of time interacting with the two oldest children,” and both of whom came to the same conclusion that “dissemination to the public of explicit details of the allegations made by the children would place them at even greater emotional risk than their present fragile state and would have a profound negative impact on their current and future therapeutic treatment”]; Matter of Katherine B., 189 AD2d 443, 447 [1993] [evidence of the need for closure was provided by the affidavit of a psychologist who twice interviewed the child in one-on-one sessions, observed a supervised visit between the child and her mother, and had reviewed the case record]; Matter of P.B. v C.C., 223 AD2d 294, 297 [1996] [noting that emotional and educational harm was “explicitly documented” in five detailed affidavits from a school principal, private tutor, school psychological consultant, independent psychologist, and attorney, who had all “been involved with the children for a number of years”].)
By contrast, the speculative opinion of the psychiatrist who has never met or observed John Doe carries less weight than the evidence adduced in Anonymous v Anonymous (263 AD2d 341, 344 [1st Dept 2000], supra), in which the Court noted: “The possibility of some unspecified future harm does not constitute a compelling interest justifying closure. The questions at issue in this custody dispute are fairly common and stand in stark contrast to the expected ‘damaging information’ justifying closure in Matter of P. B. v C. C. (223 AD2d 294, 297, supra).” (Anonymous v Anonymous, 263 AD2d 341, 344 [1st Dept 2000], supra.)
Public Interest
Besides the general public interest in open trials, independent interests[28] are implicated by the issues to be determined in this trial on Cambodian law. First, determination of the meaning of *727 the adoption permission certificates under Cambodian law may affect the many families who, in bringing Cambodian children to this country, have relied on the certificates they obtained to establish their children’s adoptive status. According to papers submitted by LMB, while some parents of Cambodian children have commenced “re-adoption” proceedings in this and other states, many other parents have assumed that they obtained completed adoptions in Cambodia which ensure their children’s immigration and citizenship status.[29] Thus, the very legal issue to be determined — based upon the testimony of experts on Cambodian law, including government officials — is a matter of significant public concern to the community of parents who are raising Cambodian children in this country.
The fact that ERJ’s witness list includes two Cambodian government officials, Samheng Boros and Mao Sovadei, Chief of Cabinet, and Director, Child Welfare Department, respectively, of the Ministry of Social Affairs, Veterans and Youth Rehabilitation, Kingdom of Cambodia,[30] is also significant.[31] The United States Government has been scrutinizing Cambodian adoption laws and procedures as it considers whether to lift the December 2001 ban on Cambodian visas imposed by the Bureau of Citizenship and Immigration Services in the Department of Homeland Security. The ban, which has been the subject of great public interest,[32] was prompted by “very serious concerns about baby-selling and rampant document fraud” (Catherine Barry, Deputy *728 Assistant Sec’y for Overseas Citizens Servs, Bur of Consular Aff, Remarks Before Subcomm on E Asian & Pac Aff, Senate Comm on Foreign Relations, Washington, D.C., June 8, 2006).
While the foreign law hearing in this case does not directly implicate the ban, the testimony of officials who are primarily responsible for adoptions in Cambodia could well have an impact on United States policy in the future. As such, deeply grounded First Amendment interests, far beyond those in an ordinary civil or criminal proceeding, must be included in the balancing test required by section 205.4, and require that the motion for closure be denied.
Domestic Relations Law § 114 Does Not Require Closure
Respondent argues that because adoption records are sealed as a matter of law, court proceedings involving adoption should similarly be subject to secrecy[33] and/or that section 205.4 should be construed to effectuate the policies that underlie the sealing statute, Domestic Relations Law § 114. While, at first blush, the argument has some appeal, it ignores the very different interests served by sealing adoption records, as demonstrated by history[34] and settled case law, which interests are notably absent here. *729 Those interests are: (1) Protecting the identity of birth parents (see, e.g. Matter of Linda F. M., 52 NY2d 236, 239 [1981], supra [“confidentiality . . . provides the natural parents with an anonymity that they may consider vital”]; Golan v Louise Wise Servs., 69 NY2d 343, 347 [1987] [“(confidentiality ensures) the privacy of (the adoption) process for those men and women who are confronted with the circumstances of an unwanted pregnancy or inability to provide the necessary care for their children” (citation omitted)]). (2) Protecting the privacy of adoptive parents and their newly formed family (see e.g. Matter of Linda F. M., 52 NY2d 236, 239 [1981], supra [“confidentiality . . . permits the adoptive parents to develop a close relationship with the child free from interference or distraction,” including protection against possible blackmail]). (3) Protecting the child from knowledge of his/her illegitimacy[35] (see e.g. Matter of Linda F. M., 52 NY2d 236, 239 [1981], supra [“confidentiality . . . shields the adopted child from possibly disturbing facts surrounding his or her birth and parentage”];[36] Matter of Anonymous, 89 Misc 2d 132, 133-134 [Sur Ct, Queens County 1976, Laurino, S.] [confidentiality “protects adopted children who are illegitimate from any possible stigma they might otherwise have to bear because of their birth”]).
It is those interests that coincide with the “State’s interest in fostering an orderly and supervised system of adoptions” (Matter of Linda F. M., 52 NY2d 236, 239 [1981], supra). Because *730 John Doe is an orphan whose parentage is unknown,[37] none of the policy considerations furthered by Domestic Relations Law § 114 are present in the instant case.
Sealing of Documents
Besides sealing the courtroom, respondent seeks an order directing that all papers in the proceeding, including all orders, motion papers, exhibits, and transcripts of the hearing, be kept under seal. The court has previously ruled by decision dated August 17, 2006 that the court records underlying LMB’s motion to vacate John Doe’s adoption shall be sealed.
In deciding whether to permit the sealing of exhibits admitted in the course of the hearing on Cambodian law and/or the transcript of the hearing, 22 NYCRR 216.1 applies. Section 216.1 provides that, in the absence of a statute or rule to the contrary, a court may not seal records, in whole or in part, except upon a particularized finding of good cause. To determine whether good cause exists, the court is required to weigh the interests of the public against those of the parties. As the rule makes clear, court records, like the hearing itself, are presumed open to the public, thus placing the burden on respondent to establish that the particular circumstances of this case justify sealing.
With respect to exhibits admitted at trial, to the extent those exhibits contain information that would otherwise be protected from disclosure under the provisions of Domestic Relations Law § 114, which mandates the sealing of all papers in adoption proceedings, they will remain under seal. To the extent such exhibits contain information that would not typically appear in an adoption file but would nevertheless, if made public, implicate the policy concerns protected under Domestic Relations Law § 114, as discussed above, that information will also remain under seal. Inasmuch as the parties have yet to disclose the exhibits they intend to introduce at trial, it is impossible to render a more exacting determination at this time. The decision whether to seal any exhibit admitted into evidence will be made on an individualized basis.
*731 With respect to respondent’s request to seal the trial transcript, public access to the transcript is equivalent to the public’s right to attend the hearing itself. Accordingly, this request is denied.
Furthermore, respondent’s request that the decisions and orders of this court be filed under seal is denied. Such decisions and orders have been and will continue to be issued under the “Baby Doe” caption.
While respondent has not made a separate request to seal John Doe’s medical records, such records are clearly confidential (CPLR 4504 [a]) and, to the extent they may be relevant to this proceeding, will remain under seal. (See Matter of Astor, 13 Misc 3d 1203[A], 2006 NY Slip Op 51677[U] [Sup Ct, NY County 2006], supra.)
Conclusion
For the above reasons, the application for an order closing the courtroom during the trial on Cambodian lawr is denied, and the application for an order permitting documents in the proceeding to be filed under seal is granted in part and denied in part.

. Foreign law is an issue of fact to be found by the court (Read v Lehigh Val. R.R. Co., 284 NY 435, 444 [1940]; Hull v Mitcheson, 64 NY 639, 640 [1876]). When affidavits submitted by the parties’ expert witnesses are contradictory, a hearing is required (see Rawitz v Rawitz, 31 AD2d 832, 833 [2d Dept 1969]).

. LMB also cross-moves for a protective order for certain witnesses he intends to call at the hearing. Tha'. cross motion is disposed of in a separate opinion.

. The readoption was granted by this court, without opposition, on April 12, 2006. On August 1, 2006, LMB filed a motion to vacate the adoption, alleging that he should have been made a party to the proceeding. He took the position that he had previously obtained a final, completed adoption of John Doe, as evidenced by a June 23, 2004 certificate issued to him by the Cambodian government. After LMB’s certificate was issued, however, he wrote a letter to the Cambodian authorities purportedly renouncing his adoption. Some 16 months later, a virtually identical certificate was issued by the Cambodian government to ERJ. LMB contends that the purported renunciation signed by him is a legal nullity under New York law, which he suggests governs any surrender of his parental rights.
After LMB sought to vacate the adoption in this court, ERJ claimed for the first time that the certificate issued by the Cambodian authorities constituted mere permission to adopt John Doe, so that LMB had obtained no rights to the child under Cambodian law and was not entitled either to notice or to process in the adoption proceeding commenced by her. The meaning of the certificates under Cambodian law is thus a first critical step in untangling a complex and sometimes unsavory set of allegations in this proceeding.

. See Richmond Newspapers, Inc. v Virginia (448 US 555, 597 [1980, Stevens, J., concurring], supra, quoting 3 Blackstone, Commentaries on the Laws of England, at 373):
“[0]pen examination of witnesses viva voce, in the presence of all mankind, is much more conducive to the clearing up of the truth, than the private and secret examination . . . where a witness may frequently depose that in private, which he will be ashamed to testify in a public and solemn tribunal.”

5. Bastardy was an unfortunately-named statutory proceeding to obtain support for children born out of wedlock. (See Schaschlo v Taishoff, 2 NY2d 408, 411 [1957].)

. As the Appellate Division has written: “Public access to court proceedings is strongly favored, both as a matter of constitutional law (Richmond Newspapers, Inc. v Virginia, 448 US 555) and as statutory imperative (Judiciary Law § 4)” (Anonymous v Anonymous, 158 AD2d 296, 297 [1st Dept 1990]).

. Prior to 1997, Family Courts acted as though these limited privacy provisions applied throughout the Family Court Act (see Besharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1043, at 125 [1999]). The Administrative Board of the court system mandated an end to that practice by adding the current subdivision (a) to section 205.4 of the Uniform Rules for Family Court (22 NYCRR). It provides, inter alia: “(a) The Family Court is open to the public. Members of the public, including the news media, shall have access to all courtrooms, lobbies, public waiting areas and other common areas of Family Court otherwise open to individuals having business before the court.”
In remarks about the 1997 amendment to Uniform Rules for Family Court § 205.4, Chief Administrative Judge Jonathan Lippman explained:
“The tradition of open courtrooms has always been a fundamental feature of our justice system, and is imbedded in our federal and state constitutions. With the establishment of the Family Court 35 years ago, a somewhat conflicting culture developed. Proceedings, although presumptively open to the public, generally took place behind closed doors to protect the privacy of children and families. . . .
“In June 1997, the Administrative Board amended Family Court Rule § 205.4, declaring to the legal community and the public, in no uncertain terms, that ‘[t]he Family Court is open to the public’ . . .
“In taking such a strong position in favor of public access, the Administrative Board has affirmed our society’s commitment to openness and the free flow of information — not only as a matter of law but of policy.” (Jonathan Lippman, Law Day 1998: Continuing to Celebrate Our Varied Freedoms, New York Rules *718 Open Family Court to Public, Media, NYLJ, May 1, 1998, at SI, cols 5-6.)

. See Matter of Astor, 13 Misc 3d 1203(A), 2006 NY Slip Op 51677(U) (Sup Ct, NY County 2006) (vacating, with limited exception, interim sealing order in celebrated Brooke Astor case in light of important First Amendment considerations).

. The only case on which respondent relies, other than cases involving attempts to unseal adoption records, is Matter of P.B. v C.C. (223 AD2d 294 [1st Dept 1996]), a custody proceeding governed by Domestic Relations Law § 235 (2).

. It may be of some significance, however, that in a decision on a discovery motion in a proceeding to vacate the adoption by Woody Allen of two of Mia Farrow’s children, the Appellate Division utilized the parties’ names in the caption and throughout, rather than employing the more protective “anonymous” caption. (Matter of Farrow v Allen, 194 AD2d 40 [1st Dept 1993].)

. Uniform Rules for Family Court § 205.4 (b) has been applied to custody disputes in Supreme Court (see e.g., Anonymous v Anonymous, 263 AD2d 341, 343 [1st Dept 2000]).

. In addition to closure, respondent requests an order “pursuant to Domestic Relations Law § 114, directing that all papers in the proceeding, including, without limitation, all orders, transcripts, exhibits, and motion papers be kept under seal.” For purposes of this discussion, her request will be treated as one for closure; the sealing of particular records, as opposed to the transcript, is dealt with separately hereinbelow.

. In addition to the entirely speculative nature of Dr. Pizarro’s “conclusions” about the possible effect of publicity on John Doe, one of his underlying premises, that “adoptive [szc] children . . . confront a host of developmental *721 and psychological risks which other children generally do not,” is not without controversy in the medical community. (See Jeffrey J. Haugaard, Is Adoption a Risk Factor for the Development of Adjustment Problems ?, 18 Clinical Psychol Rev [No. 1] 47-69 [1998] [speculating that the disparity between clinical and nonclinical studies as to whether adopted children display increased susceptibility to psychological problems may be explained by the greater propensity of adoptive parents to refer children for professional help and/or the misleading aggregation of all adopted children to include those most at risk because of their birth (i.e., fetal alcohol syndrome) and preadoption (i.e., abuse or neglect) circumstances].)

. The hypothetical includes many uncontroverted facts, but also omits “facts” which LMB has alleged and believes critical to understanding John Doe’s situation.

. For example, he states:
“[t]he media exposure and resultant peer and social attention that would be likely to occur were this case opened to the general public could increase the likelihood of insensitive questions and boundary violations by the child’s peers and society at large. I also believe that this child, because of his unique history, already presents heightened risk for developmental and psychological problems, and that it is thus likely that his ego functioning would be unduly taxed by such intrusive questioning, inappropriate disclosures about his background by peers and others, and unwarranted attention.” (Emphasis added.)

. Matter of P.B. v C.C. (223 AD2d 294 [1st Dept 1996]), discussed infra, was a custody proceeding in Supreme Court, brought prior to the 1997 amendment.

. There is also a line of cases involving delinquency proceedings, which is more akin to criminal cases with the special constitutional consideration criminal trials entail (e.g., Matter of M.F., 12 Misc 3d 1164[A], 2006 NY Slip Op 51027[U] [Fam Ct, Bronx County 2006]). Neither party has cited to nor relies upon those cases, which are thus excluded from the analysis here.

. In each of the reported cases in which closure was permitted, the children involved had been subjected to real, painful, serious harm, and, in virtually all of the cases, had already become “celebrity victims.” (E.g. Matter of S./ *722 B./B/.R. Children, 12 Misc 3d U72[A], 2006 NY Slip Op 51160[U] [2006] [infamous Nixzmary B. murder case; respondent mother and stepfather accused of severely abusing six siblings and causing the death of one of their children]; Matter of Katherine B., 189 AD2d 443 [2d Dept 1993] [child protective proceeding involving alleged kidnaping and sexual abuse over the course of a 16-day imprisonment; case was extensively reported and child’s identity already disclosed]; Matter of Ruben R., 219 AD2d 117, 118 [1st Dept 1996] [case arising out of “the brutal murder of Elisa Izquierdo, an episode which shocked New York City (and) became world-wide news”; child protective proceeding in which mother was indicted for murder of her daughter and mother and stepfather allegedly abused the surviving five children].)

. These include: (1) the insufficient and speculative nature of the evidence presented to support respondent’s claim of potential harm to John Doe; (2) the fact that, in contradistinction to this contested motion, all parties requested closure; (3) the existence in that case of specific statutory authority to close the proceeding, namely, Domestic Relations Law § 235 (2); (4) an enhanced public interest in this case based upon current federal governmental consideration of Cambodian adoption law and procedures, in connection with the possible lifting of the Immigration and Naturalization Service ban on visas for Cambodian adoptees, and the particular interest of parents who have depended upon “certificates” issued by the Cambodian government, the legal effect of which is at issue in this hearing; and (5) the Court’s concern in P.B. v C. C., not present in this trial on foreign law, about the impossibility of “anticipating] exactly what will be elicited in the examination and cross-examination of witnesses . . . The best efforts of a well-intentioned Judge cannot adequately protect against devastating revelations or allegations which may be adduced in the course of . . . [this] hotly contested and acrimonious litigation” (Matter of P.B. v C.C., 223 AD2d 294, 297-298 [1st Dept 1996], supra).

. Section 205.4 had not yet been amended to explicitly recognize the presumptive openness of Family Court (and, where there is concurrent jurisdiction, Supreme Court) proceedings. As the commentary to Domestic Relations Law § 235 notes, “Had the revised rules been in place at the time of the P.B. decision, it is possible that the result in the case might have been different.” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C235:2, at 180 [1999 ed].)

. Domestic Relations Law § 235 (2) which, by its terms, is inapplicable here, is more permissive them the judicial exegesis of section 205.4. It reads:
“If the evidence on the trial of such an action or proceeding be such that public interest requires that the examination of the witnesses should not be public, the court or referee may exclude all persons from the room except the parties to the action and their counsel, and in such case may order the evidence, when filed with the clerk, sealed up, to be exhibited only to the parties to the action or proceeding or someone interested, on order of the court.”

22. The forensic psychiatrist, unlike the psychiatrist here, actually examined the child. He spoke of the “ ‘unnecessary and known risk’ that ‘Knowledge of the details of [the child’s family life] will certainly filter down from adults to [the child’s] peers,’ ” and concluded that “ ‘allowing the public and/or the press to attend [the custody] trial will be to expose [the child] to a significantly greater risk of future mental health problems’ ” (Anonymous v Anonymous, 263 AD2d 341, 344 [1st Dept 2000], supra). Nevertheless, the Court distinguished this potential harm from the expected “damaging information justifying closure” (id. [internal quotation marks omitted]) in Matter of P.B. v C.C. (supra), also decided under Domestic Relations Law § 235 (2).

. She is also concerned that John Doe may learn the circumstances by which he came to her: he was found abandoned, taken to an orphanage where ERJ first saw him, and then brought to this country on a medical visa. But for the medical visa, this is a common story for the tens of thousands of children adopted from overseas. While not relevant to the question of Cambodian law, *725 any medical evidence preferred by the parties will be kept under seal. (See discussion infra.)

. The number of adoptions of children from foreign countries has risen dramatically over the last decade. (See <http://www.travel.state.gov/family/ adoption/stats/stats_451.html> [showing an increase in foreign adoptions from 7,093 in 1990 to 20,679 in 2006].)

. See, for example, recent accounts involving adopted Asian children in the popular press (Andy Newman, A Chinese Orphan’s Journey To a Jewish Rite of Passage, New York Times, Mar. 8, 2007, at A1; Steve Fishman, Parenting: Red Diaper Brigade, New York Magazine, June 12, 2000, at 42 [“Walk into any Upper West Side playground or Park Slope day-care center, or visit a pre-k or a play group in the Village or Chelsea, and you’re likely to spot Chinese girls . . . with white parents”]), as well as the wide coverage of celebrity adoptions such as Angelina Jolie’s recent adoption of a Vietnamese orphan (Angelina’s Viet Man, New York Post, Mar. 22, 2007, at 1; Angelina’s Tot a Real “Home” Boy, New York Post, Mar. 22, 2007, at 16).

. The adults, at least, can presumably be cautioned against this by their supervisors.

. Respondent concedes that John Doe should and will eventually know of his adoptive status.

. Independent interests increase the First Amendment concerns presumptively requiring an open courtroom. (See Sprecher v Sprecher, NYLJ, *727 June 21, 1988, at 26, col 6, [Sup Ct, NY County], supra, affd sub nom. Anonymous v Anonymous, 158 AD2d 296 [1st Dept 1990], supra [holding that, in addition to general considerations, the public’s right to be educated about the child-rearing practices of a cult required an open trial].)

. Some parents in both of these categories appear on LMB’s witness list and are the subject of his cross motion for a protective order.

. The Ministry of Social Affairs, Veterans and Youth Rehabilitation issued the certificates in question.

. When government officials testify, the matter is, by definition, other than a purely private dispute. (Cf. Matter of P.B. v C.C., 223 AD2d 294, 297 [1st Dept 1996], supra.)

. While there have been many articles in popular and scholarly print media, the Internet has been an especially rich source of continuing information about the ban and efforts to repeal it and/or to encourage the Cambodian government to institute necessary reforms. (See e.g. <http://www.jcics.org/ Cambodia.htm> [accessed Mar. 25, 2007], cached at <http://www.nycourts.gov/ reporter/webdocs/Cambodia.htm> [Web site of Joint Council on International Children’s Services, detailing actions taken by the United States and Cambodian governments through January 2007, and noting that “Department) 0(f) S(tate) continues to impress upon Cambodian officials that the United States is willing to help Cambodia in implementing both adoption-related and broader child welfare reforms. The laws are a necessary *728 prerequisite to a possible future reopening of Cambodia for intercountry adoptions to the United States”].)

. While the Uniform Adoption Act provided for both sealing records and closing adoption hearings (Uniform Adoption Act [1969] § 13 [1]), and other states have enacted statutes closing adoption proceedings (see e.g., Fla Stat Ann § 63.162), our Legislature has chosen to continue only the sealing requirements it imposed from 1924 to 1938 when the current Domestic Relations Law § 114 was enacted. The Legislature clearly knows how to close proceedings if it so chooses, as, for example, in Domestic Relations Law § 235 (2). Its failure to do so with regard to adoptions can only be “cured,” if appropriate, by statute, not by judicial construction, as proposed here by respondent.

. Adoption records were almost uniformly open until the 1920s and 1930s. (See, e.g. Lucy S. McGough and Annette Peltia-Falahahwazi, Secrets and Lies: A Model Statute for Cooperative Adoption, 60 La L Rev 13, 32-38 [1999]; Audra Behne, Balancing the Adoption Triangle: The State, the Adoptive Parents and the Birth Parents — Where Does the Adoptee Fit In?, 15 In Pub Interest 49, 51-53 [1996-1997]; Elizabeth J. Samuels, The Idea of Adoption: An Inquiry into the History of Adult Adoptee Access to Birth Records, 53 Rutgers L Rev 367 [2001].)
In New York, the Legislature first authorized courts to seal adoption records in 1924 (Matter of Walker, 64 NY2d 354, 360 [1985], citing L 1924, ch 323, § 3, amending Domestic Relations Law § 113), and made confidentiality mandatory in 1938 (Alma Socy. Inc. v Mellon, 601 F2d 1225, 1235 [2d Cir 1979], citing L 1938, ch 606; L 1968, ch 1038). The purposes behind sealing statutes, reflecting in part the mores of the day were to protect the identity of birth parents, shielding them from the humiliation of public knowledge of unwanted pregnancies or inability to support; to protect adoptive parents from possible interference by *729 the birth parents; and to shield the adopted child from the stigmatization of illegitimacy. (Secrets and Lies, supra at 38 [tracing the imposition of a “wall of secrecy” in the twentieth century and postulating that sealing statutes arose in response to market forces as “(t)he economic depressions of the 1920s and 1930s created a surfeit of poor children whose birth families could not (afford to) care for them”].) In order to encourage state-controlled, agency adoptions, rather than the previously common practice of private, contractual arrangements, “Mandatory confidentiality was the missing feature needed to attract adopting parents to the more highly regulated agency sector” (id.).

. See Secrets and Lies, supra at 34 n 91, 36 n 97 (tracing New York statutes in 1916 and 1924 mandating that “the fact of illegitimacy shall in no case appear upon the record”).

. There is no suggestion in any of the reported cases that protection of the child extends to keeping him or her from knowing that she/he was adopted. The language “facts surrounding birth and parentage” incorporates the strong social policy of the time reiterated in the recommendations of influential groups like the United States Children’s Bureau (recommending protection of adoptees from disclosure that their birth parents were unmarried) and the Child Welfare League of America (same, and protecting individuals from possible embarrassment in revealing that parent was institutionalized at time of birth). (The Idea of Adoption, supra at 386, 391.)

. Although whether Baby Doe was born out of wedlock is not at issue, it should be noted that the circumstances of one’s birth hardly carry the stigma they once did. (E.g. Matter of S./B./B./R. Children, 12 Misc 3d 1172[A], 2006 NY Slip Op 51160DJ], *2 [Fam Ct, Kings County 2006] [“fathering or bearing a child out of wedlock, once viewed as shameful or scandalous, is now publicized by proud celebrity parents, or, in the case of ‘unknown’ parents, scarcely noticed”]; see also The Idea of Adoption, supra at 418.)