[994 NYS2d 832]

# In the Matter of the Adoption of CHILD A and Another, Infants.

Surrogate's Court, Nassau County, October 2, 2014

---

### APPEARANCES OF COUNSEL

*Albanese & Albanese LLP*, Garden City, for petitioners.

*Ruskin Moscou Faltischek P.C.*, Uniondale (*Peter K. Kelly* of counsel), guardian ad litem for Child A and another.

*Eric T. Schneiderman, Attorney General*, Mineola (*Dorothy Nese* of counsel), in his statutory capacity under Executive Law § 71.

### OPINION OF THE COURT

EDWARD W. McCARTY III, J.

## I. Introduction

The following constitutes the court's decision and order concerning the closure of the Nassau County Surrogate's Court from public access during the A and C adoption related proceeding. This court has heard oral argument and reviewed the petitions and memorandum of law in this case to make the following determination. Parent father and parent mother reside in Nassau County, New York. Their children, whom they adopted from the Russian Federation, are A, born 2000, and C, born 2002.

Before exploring the complex issues in regard to denying admission to the public for a judicial proceeding, certain observations in regard to this case must be made. Judicial notice is the rule of law of evidence that allows the fact to be introduced into evidence if the truth of that fact is so notorious or well known, or so authoritatively attested, that it cannot reasonably be doubted. Judicial notice of the following aspects of the Russian/American adoption trade must be made in light of the petition in this case:

1. In the past 30 years, 60,000 Russian children have been adopted by Americans;

2. The estimated payments to private and public Russian sources have been estimated to be one third of a billion dollars;

3. Russia is not a party to the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption. This convention guarantees certain rights to adoptive children in the process of adoption;

4. An estimated 20% of Russian children adopted in the United States suffer from developmental disabilities from severe to mild;

5. Since 2001, over 18 adopted Russian children have died through violence of their adoptive parents or supervisors. Seventy-five percent of these children were in the United States for less than six months and under the age of two years;

6. In 2013, Russian President Putin publicly stopped the Russian-American adoption trade yet Russian children can still be obtained in the worldwide adoption market through other Eastern European adoption agencies;

7. Adopted Russian children have been returned to Russia without American due process; and

8. Adopted Russian children throughout the United States are currently being exchanged on the Internet through a process called re-homing without the benefit of any court or governmental supervision.

To these disturbing facts of the Russian/American adoption process, the allegations of fraud in the petition of the parents in this case are profoundly disturbing. These include:

1. Allegations of fraud in the inducement during the course of the adoption petition process by American adoption agencies;

2. Allegations of "bait and switch" of children during the adoption process by American adoption agencies; and

3. Allegations of Russian organized criminal components in the Russian/American adoption process both in Russia and the United States.

## II. Facts

In late 2006, the parents enlisted the assistance of Spence-Chapin Services to Families and Children located at 410 East 92nd Street, New York, New York 10128. The parents wanted to adopt one or two healthy children through Spence-Chapin's services from the Russian Federation. Spence-Chapin is an adoption service that has placement programs for children domestically in the United States, and internationally.

Spence-Chapin referred the parents to Cradle of Hope, located at 8630 Fenton Street, Suite 310, Silver Spring, Maryland 20910. Cradle of Hope provides adoption services to Spence-Chapin clients seeking to adopt children from Russia through the Bridge of Hope Program. The Bridge of Hope Program is described as placing children who are "selected by their orphanage directors as healthy and socially well adjusted." The parents received an information packet through the Bridge of Hope Program. The package contained various paperwork and photos of Russian children. The parents chose a photograph of two children siblings, A and C. During the summer of 2007, A visited with the parents for three weeks under the supervision of the Bridge of Hope Program. In December of 2007, the parents traveled to Russia to visit a child named C, who appeared to be the same child depicted in the information packet provided to the parents by the Bridge of Hope Program. While visiting Russia, the parents were introduced to an alleged half sister of A and C. The parents were informed that A and C were abandoned by their birth mother. The parents were told that this half sister was consenting to the adoption of A and C. She informed the parents that A and C's birth mother was in a drug rehabilitation program and their father was in prison.

On April 14, 2008, the parents adopted A and C in Russia. They never adopted the children in the United States. Processing of the adoption required a medical examination by a United States Embassy approved doctor. The children were superficially examined and cleared for entry to the United States with all tests coming back negative. The medical examination was brief, and upon their return to the United States it was discovered that the children did, in fact, have significant medical and psychiatric problems.

The parents were provided a medical report by Cradle of Hope that reflected the children had "minor developmental delays"; however, the petition alleges that the children suffered, and continue to suffer, from serious mental health disorders. The petition exemplifies this by describing multiple occasions where the children threatened to kill the parent mother, contacted unknown parties, and have been found to have been sexually abused in the past. Additionally, the petition alleges concerns that C is not the same child that the parents originally picked out in the Bridge of Hope Program package. This proceeding will help determine whether this was a mere administrative error or a "bait and switch" technique by an American adoption agency.

From May 2008 until May and September 2012, the parents explored every avenue that they could to meet the health demands of their children. The parents sought the help of leading child psychologists and continued to support A and C emotionally, medically and physically. Both A and C suffer from serious mental health diseases and have acted out and threatened to kill the parents since moving to the United States. Since mid-2012, A and C have resided in a New York State mental health facility for children in need of psychiatric care. The children are living there because medical professionals determined that it was absolutely necessary for the children to be under constant medical supervision.

The parents seek to vacate the adoption under the theory of fraud in the inducement, alleging a "bait and switch" and misrepresentation from various entities involved during the adoption process including Spence-Chapin and Cradle of Hope. The parents seek to vacate the adoption due to newly discovered evidence, alleging that A and C have been criminally programmed, they have severe psychiatric illnesses and they are unable to form familial bonds. The parents also seek to vacate the adoption for cause, alleging the parents are in danger of being harmed by A and C, and that both A and C are in danger of harming themselves. Additionally, the petition alleges that the original birth father of both A and C never consented to the adoption and, therefore, it is invalid.

### III. Public Access as Opposed to Trials in Secret

The Judiciary Law codifies the presumption of an open trial:

> "The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, criminal sexual act, bastardy or filiation, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court." (Judiciary Law § 4.)

Public trials are an essential facet of our judicial system. As Justice Holmes stated in *Cowley v Pulsifer* (137 Mass 392, 394 [1884]):

> "It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public

concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."

The First Amendment grants access to the public in criminal trials. Public access is equally extended to civil trials (*Danco Labs. v Chemical Works of Gedeon Richter*, 274 AD2d 1, 6-7 [1st Dept 2000]). The United States Supreme Court stated in *Richmond Newspapers, Inc. v Virginia* (448 US 555, 578 [1980]) that open trials "enhance the integrity and quality of what takes place" and increase the veracity of witness testimony.

### IV. A Balance of Equity and Facts: an Open Courtroom against the Concept of a Closed Courtroom

A party must make a compelling argument to overcome the presumption of an open courtroom. The presumption is a difficult task to overcome, even when children are involved (*Anonymous v Anonymous*, 263 AD2d 341, 342 [1st Dept 2000]; *also see Anonymous v Anonymous*, 158 AD2d 296 [1st Dept 1990]). Compelling circumstances are required to overcome the presumption of an open courtroom (*Matter of Herald Co. v Weisenberg*, 89 AD2d 224, 226 [4th Dept 1982]). It has been argued, and other courts have considered 22 NYCRR 205.4, a Family Court trial rule, which provides further privacy rights to parties in court when the custody of children is involved. However, as stated in *Matter of Capital Newspapers Div. of Hearst Corp. v Moynihan* (71 NY2d 263, 271 [1988]), when the presumption of an open courtroom has been modified, the legislature has done so "in specific language . . . and these exceptions have been strictly construed by the courts." Therefore, it should not be extended to a proceeding vacating an adoption.

Even if the test is considered, this case fails to set forth compelling circumstances. When considering closure under 22 NYCRR 205.4, the significant interests of the public and society as a whole must be weighed against any potential harm to children involved. The presumption can only be overcome when evidence of a harm or potential harm is compelling. Therefore, the severity of the harm and the specific evidence leading to the harm must be considered.

There will always be an argument to close a courtroom when children are involved—to shield their lives from the public eye.

However, if closure were granted in every case involving a child, it would no longer be an exception, it would be the rule. The court's position is bolstered by another court's holding of an open courtroom in an adoption case, where public interest was great (*Matter of Doe*, 16 Misc 3d 714 [Sur Ct, NY County 2007]).

Additional case law in New York State compels public access to public proceedings: *Anonymous v Anonymous* (263 AD2d 341, 344 [1st Dept 2000]); *Merrick v Merrick* (154 Misc 2d 559 [Sup Ct, NY County 1992]); and *Anonymous v Anonymous* (158 AD2d 296 [1st Dept 1990]).

## V. Proof of Harm: Court Proceedings Concerning Children and Issues of Public Access

There must be a concrete showing of proof of harm against the children. Mere speculation of harm is insufficient (*Merrick v Merrick*, 154 Misc 2d 559 [Sup Ct, NY County 1992]). When closure of a courtroom has been granted, courts used factually supportable evidence offered by medical professionals who recently observed the children involved in those cases, holding that it would be traumatizing to the children considering their mental health to have to come into court. However, in the case before this court, a definitive proof of harm is only speculation and has not been shown by the petitioners. In our case, it must be noted that the identity of the children and parents will remain anonymous, and there is the strongest of possibilities that the children will not be present at court proceedings.

## VI. General Secrecy in Adoption Related Proceedings Does Not Require Closure

Although adoption records are sealed and considered secret pursuant to Domestic Relations Law § 114, an argument extending this secrecy to closure of the courtroom in cases of dissolving an adoption will be unavailing. It must be noted that the following interests are served by sealing adoption proceeding and records, none of which will be accomplished by closure of the courtroom in our case. The legal principles requiring the closing of a courtroom in adoption cases are clear:

1. Protecting the identity of all parents (*Matter of Linda F. M.*, 52 NY2d 236, 239 [1981]);

2. Protecting the privacy of adoptive parents and their new family (*id.*); and

3. Protecting the child of his/her adoptive status (*id.*).

The parents involved in this case may no longer be considered parents at the conclusion of this matter, there will not be a new family and the children are already aware of their adoptive status.

## VII. Public Interest in Russian/American Adoption Cases

In addition to the general public interest in this case, independent interests are also implicated. The issue in this case will be important, generally and independently, to different people throughout the United States and Russia.

First, the court's determination with regard to the allegations of fraud will be of significant concern to Russian children being offered for adoption. This court will take judicial notice of the fact that the 2013 prohibition on Russian/American adoptions by Russia has not ended the Russian/American adoption trade.

Second, the psychological well-being and the mental health of children that have been or may be adopted from the Russian Federation will be of great public concern for any person who has adopted or may be considering an adoption.

Third, the public will have humanitarian concerns over how children are being treated in Russia, and what developmental disabilities are resulting from their treatment.

Fourth, this case will be of great public concern to all families considering adoption through the services rendered by Spence-Chapin and Cradle of Hope. The outcome of this case will have rippling implications on related subject matter throughout the United States and Russia.

## VIII. Conclusion

Due to the heightened public interest in this case, and the amount of families that have adopted children in the past and who will adopt in the future from Russia, the application for an order closing the courtroom during this trial is denied. This court must note that the need for cogent and logical scrutiny of a public action is a cornerstone of democracy. This matter is far too important to the people of Nassau County, the United States and Russia to limit the public to its unique factual issues.

The actions of the media in their coverage of this proceeding is not without reservations. They should not make any attempts to identify A, C or the parents. If such attempts are made, this court will strongly reconsider the issue of public access.