OPINION OF THE COURT
Edward W. McCarty III, S.
I. Introduction
The following constitutes the court’s decision and order concerning the issue of re-homing in the Nassau County Surrogate’s Court, reviewed during the Child A and Child C adoption related proceeding (45 Misc 3d 1017 [Sur Ct, Nassau County 2014]).
Parent father (hereinafter PF) and parent mother (hereinafter PM) reside in Nassau County, New York. They adopted the children, Child A and Child C, in Russia in 2008. Child A was born in 2000 and Child C was born in 2002. They seek a decree denying recognition of the Russian adoption order or, alternatively, vacating the Russian adoption order.
Before exploring the re-homing issue certain observations in regard to this case must be made. Judicial notice is the rule of law of evidence that allows the fact to be introduced into evidence if the truth of that fact is so notorious or well known, or so authoritatively attested, that it cannot be reasonably doubted. This decision will also take judicial notice of the many undisputed facts of the Russian/American adoption trade as well as the practice of re-homing of children.
1. In the past 30 years, 60,000 Russian children have been adopted by Americans;
2. The estimated payments to private and public Russian sources have been estimated to be one third of one billion dollars;
*1035 3. Russia is not a party to the Hague Convention on Protection of Children and Co-Operation in Respect of Intercountry Adoption (32 ILM 1134 [1993]). This convention guarantees certain rights to adoptive children and the process of adoption;
4. An estimated 20% of Russian children adopted in the United States suffer from developmental disabilities from severe to mild;
5. Since 2001, over 18 adopted Russian children have died through violence of their adoptive parents or supervisors. Seventy-five percent of these children were in the United States for less than six months and under the age of two years;
6. In 2013, Russian President Putin publicly stopped the Russian-American adoption trade yet Russian children can still be obtained in the worldwide adoption market through other Eastern European adoption agencies;
7. Adopted Russian children have been returned to Russia without American due process; and
8. Adopted Russian children throughout the United States are currently being exchanged on the Internet through a process called re-homing without the benefit of any court or governmental supervision.
II. Re-Homing
If the application for recision of their adoption status by PF and PM is denied they may wish to pursue the process called re-homing. A successful resolution in this procedure by PF and PM will terminate their parental responsibilities concerning Child A and Child C. This potential action will now be addressed by this court.
Re-homing is the placement or replacement of a child with new caregivers who are not related to that child. It is a procedure outside of official government and judicial review in the unofficial and involuntary transfer of children (see Donovan M. Steltzner, Intercountry Adoption: Toward a Regime That Recognizes the “Best Interests” of Adoptive Parents, 35 Case W Res J Intl L 113, 132 [2003]). Last year in the United States it has been estimated that between 200 and 300 foreign and American born children were traded in this Internet fashion. Most often the transfers of these children found them to be between the ages of 6 to 14 with some as young as 10 months. The most often cited reason for the rejection by their adoptive/natural parents is a failure to bond (Megan Twohey, Americans use the *1036 Internet to abandon children adopted from overseas, Reuters Investigates: The Child Exchange: Inside America’s underground market for adopted children [Sept. 9, 2013], available at: http://www.reuters.eom/investigates/adoption/#article/partl).
The procedure of re-homing is technically not an adoption by the receiving person(s). The transfer of custody of the child to a stranger is often done pursuant to a power of attorney. Most states and courts have been reluctant to make any investigation into or take any legislative action condemning re-homing.
Through the process of re-homing children are:
1. Not placed for adoption with any government notice;
2. Not placed through any government approved foster care agency; and
3. Not placed through an adoption agency.
Placement of the to-be re-homed child is made through advertising on the Internet or other public media process.
1. There is no prior home study of the accepting person;
2. There is no court approval of the process;
3. There is no court supervision of the process;
4. It is often accomplished with the person placing the child knowing little, if anything, of the person or persons with whom the child is placed.
In 2014 children are still being sent off to receiving person(s) with their original adoption papers or birth certificate and a power of attorney from the sending parents to the receiving person(s). Such re-homing or any other descriptive phrase to classify this trade is unmistakably “human trafficking in children,” even absent any financial element being present. This decision is an attempt to publicize the re-homing trade in children.
III. Considerations Concerning Re-Homing
The court’s original intention was to enact a local rule to forbid the kind of re-homing I have been discussing. However, I am now of the opinion that a local rule will likely be both improper and inadequate.
The court is aware of the provisions of Social Services Law §374 which appear to authorize this very practice, though that was not and could not have been the intent of the legislature in enacting this statute. The court urges the legislature to amend Social Services Law § 374 to permit the temporary placement of *1037 a child where the parent is currently unable to provide sufficient care, but to prohibit the unsavory and unsupervised practice of adoptive parents ridding themselves of the responsibility of caring for their children by placing them with people whose motives and qualifications are, at best, entirely unknown.
IV Conclusion
This decision is a first step to control re-homing and the unofficial adoption process. In the event that PF and PM’s application for the dissolution of their adoption status is denied and they wish to place the children with another person or persons they must make an application to do so through this court. A guardian ad litem will be appointed to determine the best interests of the children and his or her report will be issued for further action to the Surrogate. This decision marks an attempt by this court to regulate the re-homing trade in children.